THE PEOPLE *ex rel.* NEIL F. HARTIGAN, Attorney General, Plaintiff and Counterdefendant-Appellee, v. KNECHT SERVICES, INC., a/k/a AAA Knecht, Inc., *et al.,* Defendants and Counterplaintiffs-Appellants.

Second District Nos. 2—90—0697, 2—90—0839 cons.

Opinion filed July 26, 1991.—Rehearing denied August 27, 1991.

Shari L. Friedman, of Keck, Mahin & Cate, of Chicago (Richard K. Wray, of counsel), for appellants.

Roland W. Burris, Attorney General, of Springfield (Colleen McLaughlin, Assistant State's Attorney, of Wheaton, of counsel), for appellee.

Patricia M. Kelly, of Illinois Retail Merchants Association, of Chicago, for *amicus curiae*.

JUSTICE INGLIS delivered the opinion of the court:

Plaintiff, the People of the State of Illinois *ex rel.* Neil F. Hartigan, Attorney General, filed a six-count complaint against defendants, Knecht Services, Inc., a/k/a AAA Knecht, Inc., and James M. Knecht individually, president of Knecht Services, Inc., seeking injunctive and other relief based on allegations that defendants violated the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (Ill. Rev. Stat. 1987, ch. 121½, par. 261 *et seq.*) by engaging in certain unfair or deceptive practices with respect to their advertising, servicing, and charging of customers in their plumbing, heating, and air-conditioning business. A counterclaim was filed by Knecht against Attorney General Neil Hartigan for defamation based on allegations that Hartigan made false and misleading statements about Knecht and Knecht Services, Inc.

After a six-week bench trial, the trial court entered judgment in favor of defendants on counts I through IV of the complaint, which were titled, respectively, as follows: "(I) Home Repair Fraud"; (II) "Misrepresentation as Plumber/False Advertisement"; (III) "Notice of Cancellation" (premised on section 2B of the Consumer Fraud Act (Ill. Rev. Stat. 1987, ch. 121½, par. 262B)); and (IV) "Used Parts" (installed instead of new parts). Judgment was entered against defendant Knecht Services, Inc., on count V of the complaint, entitled "Poor Workmanship" but in favor of Knecht, individually. Judgment was entered against both Knecht Services, Inc., and Knecht individually, on count VI of the complaint, entitled "Excessive Charges." Defendants' post-trial motion was denied, and they filed a timely notice of appeal. The trial court subsequently granted the Attorney General's motion to dismiss the counterclaim filed against him, and defendants appeal that order as well. The two appeals have been consolidated, and the Illinois Retail Merchants Association was permitted to file an *amicus curiae* brief.

The following issues are raised by the appeal: (1) whether the trial court was correct in finding that a contract implied in law was created; (2) whether the Consumer Fraud Act is applicable in the absence of a finding that little or no services were rendered; (3) whether the failure to call a former employee as a witness at trial can properly be considered in rendering judgment against the former employer; (4) whether the judgment of the court with regard to counts V and VI is against the manifest weight of the evidence; and (5) whether the trial court erred in finding the Attorney General absolutely immune from liability. We affirm.

Briefly, the record reveals the following facts. Knecht Services, Inc., is an Illinois corporation with its principal place of business at the residence of defendant James Knecht. Knecht has been in the business of performing home repairs, consisting primarily of repair or replacement of boilers, forced air furnaces, water heaters, central air-conditioners, and related equipment since 1962. He has worked full time as the proprietor of his own business since 1976. Knecht testified that as his business grew and he saw the need to employ helpers, he developed written checklists of the service items to be reviewed on each particular job. The company's practice was to be both methodical and thorough in diagnosing and repairing mechanical problems. According to Knecht, his methodical checklist approach to heating and cooling systems has resulted in his repeatedly finding and correcting systems failures.

Plaintiff presented evidence indicating that from the mid-1970's to 1987, defendants placed the following advertisement in the Yellow Pages of the phone book: "HONESTY & MINIMUM CHARGE IS OUR POLICY." The advertisement was subsequently changed in 1987 to read: "HONESTY & HIGHEST QUALITY IS OUR POLICY." The advertisement was listed under the heading "plumbing contractors" at a time when no one at Knecht Services, Inc., had a plumber's or apprentice plumber's license.

While defendants presented testimony from satisfied customers, plaintiff presented testimony from numerous dissatisfied customers in an effort to support the six-count complaint. There was much testimony given on behalf of plaintiffs comparing defendants' business practices to customary practices. According to plaintiff's experts, at the time of trial, the prevailing hourly rate in the area for heating and air-conditioning repair services was $44 to $48 per hour, and for plumbers it was $52 per hour or less. When Knecht charged by the hour, as opposed to a flat rate, he charged $69 per hour, plus a one-hour minimum fee of $69 for a trip charge. Knecht had been in the

policy of charging customers a "premium" for certain types of services, such as $120 per hour for work on a window air-conditioner and $30 per hour extra for service in a crawl space.

Contrary to industry custom, defendants failed to inform consumers when overtime rates were to be charged. Defendants also performed routine maintenance during overtime service calls without affording the customer the option of having the routine services performed during regular working hours. Even during regular working hours, defendants routinely performed or offered to perform unnecessary repairs or maintenance.

Plaintiff's experts indicated that defendants took two or three times longer than necessary to complete repair work and they consistently charged for parts at least three to four times more than a reasonable retail price or the manufacturer's suggested retail price. Defendants also utilized the services of a subcontractor and charged consumers three to four times more than what the subcontractor charged defendants for the services rendered.

There was also testimony presented indicating that defendants had refused to provide quotes. When Knecht and Robert Leo, an employee of defendants, did quote a price, they often charged the customer a substantially higher price. In addition, defendants frequently charged consumers for two servicemen when only one performed the work or when only one worker was necessary. Consumers were sometimes charged with tradesmen rates when the work was performed by apprentices or helpers.

Finally, there was testimony indicating that Knecht Services, Inc. utilized the services of untrained and unsupervised helpers who provided shoddy and unnecessary services. In addition to incidents involving other workers, there was testimony that Robert Leo installed a water heater for a consumer at a time when he was unlicensed, even as an apprentice plumber. His work was reportedly done in a totally unworkmanlike manner, and intimidation was used to collect payment. Subsequently the consumer had to hire a licensed plumber to redo the installation.

After the conclusion of the trial, the trial court entered judgment in favor of defendants on counts I through IV of the complaint. Judgment was entered against defendant Knecht Services, Inc., only, on count V of the complaint, which was entitled "Poor Workmanship." The court specifically found that the evidence did not establish that Knecht personally performed any shoddy or unworkmanlike services. However, the trial court entered judgment against both Knecht and Knecht Services, Inc., on count VI of the complaint, which al-

leged excessive charges. The court concluded, without argument in support from either side, that when defendants perform work for a customer without any preliminary discussion or agreement as to how the charges for work and materials are to be computed, a contract implied in law is created. In such a situation, the customer is only obligated to pay the "reasonable value" of the services rendered, and the court has the right to determine whether charges made in an implied contract are reasonable. The court concluded that defendants' charges were not reasonable, and judgment was entered against them.

The court then entered a permanent mandatory injunction allowing defendants to continue in business provided they comply with certain conditions, including informing customers in advance of the charge for a service call and, upon arriving at the customer's home, obtaining the customer's written approval of the diagnostic fee. Once the problem is diagnosed, defendants must provide a written estimate and have the customer acknowledge its receipt in writing. Defendants were further enjoined "from making any threats or other actions either express or implied intended to coerce the customer to pay." A civil fine of $10,000, as authorized by the Consumer Fraud Act (Ill. Rev. Stat. 1987, ch. 121½, par. 267), was imposed on defendants jointly.

The trial court dismissed the counterclaim filed by defendants against Attorney General Neil Hartigan. The court found the Attorney General to be absolutely immune from the claim of defamation. Defendants appeal not only from the dismissal of the counterclaim but also from the trial court's judgment on counts V and VI of the complaint as well.

Defendants first argue that the trial court erred in entering judgment in favor of plaintiff on count VI of the complaint, which alleged excessive charges. In rendering its judgment, the trial court held that because defendants' charges were far in excess of the reasonable value of the services, the Consumer Fraud Act imposed upon Knecht "the duty to advise of the manner in which he computes bills for his services, before he does any work whatever including making a service call." The trial court ruled that, where defendants had been called to perform work and had completed that work prior to disclosing what their charges would be, no express contract was created; rather, only a contract implied in law was created. According to the trial court, in such situations, the consumer is only obligated to pay the "reasonable value" of the services.

Defendants initially argue that the trial court erred in determining that a contract implied in law was created. They contend that, rather, a contract implied in fact was created.

■ An implied contract is created as a result of the parties' acts; such contracts are further divided into contracts implied in fact and those implied in law. (*Heavey v. Ehret* (1988), 166 Ill. App. 3d 347, 354.) Contracts implied in fact arise from a promissory expression which may be inferred from the facts and circumstances showing an intent to be bound. (*Century 21 Castles By King, Ltd. v. First National Bank* (1988), 170 Ill. App. 3d 544, 548.) Contracts implied in law result, notwithstanding the parties' intentions, from a duty imposed by law and are contracts merely in the sense that they are created and governed by principles of equity. (*Heavey*, 166 Ill. App. 3d at 354-55.) No claim of a contract implied in law can be asserted if an express contract or a contract implied in fact exists between the parties and concerns the same subject matter. *Heavey*, 166 Ill. App. 3d at 355.

■■ ■ We hold that the trial court's finding of a contract implied in law is manifestly against the weight of the evidence. (*Century 21*, 170 Ill. App. 3d at 549.) "In order to establish an implied in fact contract to pay for services, the party seeking payment must show that the services were carried out under such circumstances as to give the recipient reason to understand that they were not performed for some other person, and that they were not rendered gratuitously." (12 Ill. L. & Prac. *Contracts* §5, at 246 (1983).) In the case at bar, the consumers contacted defendants requesting their services. Testimony indicated that the consumers intended to pay defendants for the services rendered. Thus, it is clear that the consumers were aware that the services were being performed for them and were not rendered gratuitously.

Plaintiff argues that a contract implied in fact cannot exist because there was never a meeting of the minds nor assent to any terms. Plaintiff concludes that a contract implied in law must therefore exist. (*Euclid Engineering Corp. v. Illinois Power Co.* (1967), 79 Ill. App. 2d 145, 152.) However, "contracts based on promises implied in fact arise on circumstances being proved which, according to the ordinary course of dealing and the common understanding of persons, show that it is in law regarded as sufficient for a mutual intent to contract." (12 Ill. L. & Prac. *Contracts* §5, at 245-46 (1983).) Here, the fact that the consumers contacted defendants for their services and defendants provided those services indicates, in the ordinary course of dealing, a mutual intent to contract. Further, the con-

sumers admittedly intended to pay defendants their regular charges. Thus, we find sufficient intent to support a contract in fact. Consequently, a contract in law finding is barred. *Heavey*, 166 Ill. App. 3d at 355.

In its brief to this court, plaintiff contends that the trial court was correct in its ruling; however, plaintiff maintains that use of a contract theory leaves many gaps and inconsistencies within the trial court's decision. It proposes that a different analysis under the Consumer Fraud Act is more appropriate. Specifically, plaintiff argues that, under the Consumer Fraud Act, defendants' actions were unfair and deceptive.

Defendants contend that the State may not raise these arguments on appeal because the trial court made findings contrary to those arguments and no cross-appeal was filed by plaintiff. In ruling in favor of plaintiff on the excessive charges count, the court noted:

> "Knecht has the absolute right to set his charges, and his setting them at a much higher figure than others in the industry is not, in itself, a violation of the Consumer's [*sic*] Fraud Act. However, failing to advise in advance of this practise [*sic*], and not announcing the results of his computation until the work has been accomplished does violate the act."

Defendants contend that in making the above ruling, the trial court found that defendants' prices were not unconscionable; therefore, in the absence of a cross-appeal, plaintiff should be barred from arguing to the contrary.

Initially, we note our disagreement with defendants' claim that the trial court found defendants' prices not to be unconscionable. Throughout its ruling, the court referred to defendants' prices as "outrageous," "not reasonable," "gouging," and "improper." However, the court concluded that excessively high prices, alone, did not violate the Consumer Fraud Act. At no time did the court conclude that defendants' prices were not unconscionable.

■ ■ Further, we disagree with defendants' argument regarding the cross-appeal. Findings of the trial court adverse to the appellee do not require the appellee's cross-appeal if the judgment of the trial court was not at least in part against the appellee (*Material Service Corp. v. Department of Revenue* (1983), 98 Ill. 2d 382, 387.) It is the judgment rather than the reasoning of the court that is to be reviewed on appeal (*City of Evanston v. Regional Transportation Authority* (1991), 209 Ill. App. 3d 447, 457); thus, the necessity of filing a cross-appeal arises only in situations where the appellee requests the reversal or modification of the judgment below. (*Mid-West Na-*

*tional Bank v. Metcoff* (1974), 23 Ill. App. 3d 607, 610.) Because plaintiff simply requests the affirmance of the trial court's judgment on counts V and VI of the complaint, no cross-appeal was necessary. Defendants' citation to *Iacovelli v. First Security Trust & Savings Bank* (1990), 202 Ill. App. 3d 982, and *Cleys v. Village of Palatine* (1980), 89 Ill. App. 3d 630, does not persuade us to the contrary. In those cases, the judgment of the trial court was at least in part against the appellee. (*Iacovelli*, 202 Ill. App. 3d at 985; *Cleys*, 89 Ill. App. 3d at 635.) Here, judgment was entered in favor of plaintiff, and plaintiff does not seek reversal or modification of that judgment. Consequently, no cross-appeal was necessary.

 █ As a reviewing court, we can sustain the decision of the trial court on any grounds which are called for by the record regardless of whether the circuit court's reasoning was correct. (*Bell v. Louisville & Nashville R.R. Co.* (1985), 106 Ill. 2d 135, 148.) Thus, we next consider whether defendants' actions were unfair or deceptive under the Consumer Fraud Act. Section 2 of the Act forbids unfair or deceptive acts, or practices, including the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, in the conduct of any trade or business with the intent that others rely on the deceptive practices. (Ill. Rev. Stat. 1987, ch. 121½, par. 262; *People ex rel. Daley v. Grady* (1989), 192 Ill. App. 3d 330, 332.) Thus, in order to fall within the purview of section 2, it need only be shown that defendants are engaged in a trade or commerce and in unfair or deceptive acts or practices in the conduct of that trade or commerce. (*People ex rel. Hartigan v. Stianos* (1985), 131 Ill. App. 3d 575, 580.) Clearly, defendants are engaged in trade or commerce. (Ill. Rev. Stat. 1987, ch. 121½, par. 261(f).) Plaintiff argues that defendants' actions were both unfair and deceptive. Plaintiff notes that a practice may be unfair without being deceptive (see *Federal Trade Comm'n v. Sperry & Hutchinson Co.* (1972), 405 U.S. 233, 31 L. Ed. 2d 170, 92 S. Ct. 898) and thus presents the two arguments separately.

 The determination of whether a certain practice is "unfair" under the Consumer Fraud Act requires a case-by-case determination. (*Elder v. Coronet Insurance Co.* (1990), 201 Ill. App. 3d 733, 742; *People ex rel. Fahner v. Testa* (1983), 112 Ill. App. 3d 834, 837.) However, the Illinois legislature has specifically stated that, in construing section 2 of the Act, "consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission

Act." (Ill. Rev. Stat. 1987, ch. 121½, par. 262.) Section 5(a) of the Federal Trade Commission Act (15 U.S.C. §45(a)(1) (1982)) provides that unfair methods of competition in or affecting commerce are declared unlawful. In *Federal Trade Comm'n v. Sperry & Hutchinson Co.*, the Supreme Court set out the standards employed in determining whether a practice is unfair:

> " '(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise— whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).' " 405 U.S. at 244-45 n.5, 31 L. Ed. 2d at 179 n.5, 92 S. Ct. at 905 n.5, quoting 29 Fed. Reg. 8355 (1964).

See also *People ex rel. Fahner v. Walsh* (1984), 122 Ill. App. 3d 481, 484; *People ex rel. Fahner v. Hedrich* (1982), 108 Ill. App. 3d 83, 89.

Plaintiff contends that unconscionably high prices alone are sufficient to render a contract "unfair" under the Consumer Fraud Act. Plaintiff then argues that this court has already determined that defendants' prices were unconscionably high in *Ahern v. Knecht* (1990), 202 Ill. App. 3d 709. In *Ahern*, a consumer brought a small claims action to recover monies paid to defendant, James Knecht, for the repair of a central air-conditioning unit. The trial court found that defendant should have charged $150 for his work, rather than the $762 he charged. After the court deducted $72, the amount paid to a subsequent repairman, defendant was allowed a total of $78 for his work. The trial court then entered judgment in favor of the plaintiff in the amount of $684. Defendant appealed, and we affirmed, finding that the circumstances existing when the contract was entered were such that the terms of the contract should be set aside as unconscionable. *Ahern*, 202 Ill. App. 3d at 716.

In *Ahern*, we held that while gross excessiveness of price alone can make an agreement unconscionable, it is clear that the services rendered by defendant were of little or no value in contrast to the price paid. (*Ahern*, 202 Ill. App. 3d at 716.) We noted defendant's superior bargaining position, given the consumer's lack of experience in this type of transaction, his substantial charge for travel and diagnosis, his representations that the services were all necessary, and his insistence on immediate payment suggesting urgency. We concluded that the consumer had no meaningful choice and the agreement was

not voluntarily and understandingly entered into. (*Ahern*, 202 Ill. App. 3d at 717.) Consequently, we affirmed the trial court's decision to set aside the unconscionable terms of the agreement and to allow defendant the actual value of his services. *Ahern*, 202 Ill. App. 3d 709.

The consumer in *Ahern* also testified on behalf of plaintiff in the case at bar regarding the previously litigated incident. Plaintiff contends that our ruling in *Ahern* is sufficient evidence to support the judgment of the trial court in the present case. We disagree. Our ruling in *Ahern* was based on the requirements necessary to rescind a contract, not on the requirements necessary to prove "unfairness" under the Consumer Fraud Act. (*Ahern*, 202 Ill. App. 3d at 715-16.) Plaintiff argues, without citation to authority, that "the factors used by many courts in determining what is unfair parallel the criteria Illinois courts have used when determining whether a contract is unconscionable." However, because plaintiff has failed to offer any authority in support of this argument, we need not consider it as it is waived. 134 Ill. 2d R. 341(e)(7); *Schwebl v. Seifer* (1991), 208 Ill. App. 3d 176, 182; see *Spengler v. V & R Marathon, Inc.* (1987), 162 Ill. App. 3d 715, 717 (Consumer Fraud Act differs from a common-law action in fraud).

Defendants contend that it is not enough that their prices were unconscionable. The *amicus* brief filed by the Illinois Retail Merchants Association argues the same. Both contend that in order to prove a violation of the Consumer Fraud Act on the basis of high prices, it must be shown that the prices were unconscionably high, that little or no services were rendered, and that the consumer had no real alternative. *Hedrich*, 108 Ill. App. 3d at 89-90; see also *Lane v. Fabert* (1989), 178 Ill. App. 3d 698, 705.

In *Hedrich*, this court held that a mobile home park committed an unfair practice by not allowing residents of the park to sell their homes without paying a large transfer fee, while providing essentially no services related to the transfer. In applying the three-prong test set forth in *Sperry & Hutchinson*, we found that charging an unconscionably disproportionate price for little or no services offends public policy. (*Hedrich*, 108 Ill. App. 3d at 90.) We then found that the defendant was able to collect the unconscionably large fee for little or no services merely because the residents were in a position in which they had no reasonable alternative but to pay and agree to pay; we found this practice to be oppressive. (*Hedrich*, 108 Ill. App. 3d at 90.) Finally, we found that the residents of the park, as consumers, were injured by the defendant's practices. (*Hedrich*, 108 Ill.

App. 3d at 90.) Consequently, the defendant's practices were found to violate the Consumer Fraud Act.

We do not find that the holding in *Hedrich* set forth new criteria in determining whether a practice violates the Consumer Fraud Act; rather, we used the *Sperry & Hutchinson* test, which remains in effect. However, the facts and holding in *Hedrich* do tend to support defendants' contention that simply charging unconscionably high prices, by itself, is not unfair within the meaning of the Consumer Fraud Act. See also *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.* (1986), 114 Ill. 2d 278, 291-92.

Plaintiff argues that there were other factors, in addition to the unconscionably high prices. Plaintiff argues, *inter alia*, that the parties were in unequal bargaining positions, that defendants charged overtime rates for same day service during regular working hours, that defendants charged premiums without the consumer's knowledge for certain types of work, that defendants charged for two servicemen when only one was required, that defendants padded their labor time, that defendants failed to quote or misquoted the cost of services, that defendants charged for two tradesmen when providing one tradesman and one helper, that defendants performed routine tasks while on overtime, that defendants sold parts unnecessary to the repairs while on overtime, that defendants charged for work not done, that defendants performed unnecessary repairs, that defendants recommended service where it was not warranted, and that defendants intimidated customers into paying.

■ In applying the *Sperry & Hutchinson* standards to the case at bar, we find that defendants' practices were unfair. First, we note that charging for services that were not rendered and charging for servicemen that were not needed or not present offends public policy. Second, we find that defendants were in a superior bargaining position and used intimidation to collect payment; this we find to be unethical. Finally, we find that by charging excessively high prices, defendants caused substantial injury to consumers. Consequently, defendants' actions were unfair and violated the Consumer Fraud Act.

■■ Next, we consider plaintiff's contention that defendants' practices were deceptive. To establish a deceptive practice claim, a plaintiff "must show (1) a deceptive act or practice, (2) an intent by defendants that he rely on the deception, and (3) the deception occurred in the course of conduct involving a trade or commerce." (*Crowder v. Bob Oberling Enterprises, Inc.* (1986), 148 Ill. App. 3d 313, 316.) Section 2 of the Uniform Deceptive Trade Practices Act

(Act) (Ill. Rev. Stat. 1987, ch. 121½, par. 311 *et seq.*), which is incorporated into the Consumer Fraud Act (Ill. Rev. Stat. 1987, ch. 121½, par. 262), defines certain conduct as deceptive. In part, the Act provides:

> "A person engages in a deceptive trade practice when, in the course of his business, vocation or occupation, he:
>
> * * *
>
> (7) represents that goods or services are a particular standard, quality or grade or that goods are a particular style or model, if they are of another;
>
> * * *
>
> (9) advertises goods or services with intent not to sell them as advertised;
>
> * * *
>
> (12) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ill. Rev. Stat. 1987, ch. 121½, par. 312.

■■■ ■ An advertisement has been held to be deceptive on its face if it creates the likelihood of deception or has the capacity to deceive. (*Williams v. Bruno Appliance & Furniture Mart, Inc.* (1978), 62 Ill. App. 3d 219, 222.) In affirmative misrepresentation or omission cases under the Act, a plaintiff must allege the misrepresentation of a material fact. (*Elder*, 201 Ill. App. 3d at 751.) A misrepresentation is material if it relates to a matter upon which the plaintiff could be expected to rely in determining whether to engage in the conduct in question. *Elder*, 201 Ill. App. 3d at 751.

■■■ Here, defendants advertised that their services were offered at a "minimum charge." The record indicates that defendants' advertisements were far from accurate. While they may have been an insufficient basis for a false advertising claim, we find that they were sufficiently deceptive to support a Consumer Fraud Act violation. In particular, defendants advertised that their services were offered at a minimum charge, the record showed that defendants' charges were anything but minimal; yet, consumers could have been expected to rely on such a statement in determining whether to solicit defendants' services. (*Elder*, 201 Ill. App. 3d at 751.) The statement was likely to create a misunderstanding as to defendants' charges and was therefore deceptive. (Ill. Rev. Stat. 1987, ch. 121½, par. 312(12).) Further, we find that defendants intended the consumers to rely on the deception, which occurred in the course of conduct involving trade or commerce. (*Crowder*, 148 Ill. App. 3d at 316.) Conse-

quently, we find that defendants' practices were deceptive in violation of the Consumer Fraud Act.

The Illinois Retail Merchants Association argues in its *amicus* brief that it was neither deceptive nor fraudulent for defendants not to disclose their pricing practices since there was no special duty or relationship requiring disclosure. The Association relies on *Stefani v. Baird & Warner, Inc.* (1987), 157 Ill. App. 3d 167, 174-75. However, *Stefani* involved the concealment, suppression or omission of a material fact, whereas the present case involves deception and misrepresentation. Thus, it is not simply a matter of nondisclosure and *Stefani* is, therefore, inapplicable.

Defendants make various arguments in support of their contention that courts should not interfere with contracts to which parties have agreed. However, the cases relied upon by defendants deal with the issue of setting aside or rescinding a contract, which is not the situation in the present case. Here, plaintiff sought relief under the Consumer Fraud Act, and thus the cases cited by defendants are inapplicable.

Next, defendants contend that it was reversible error for the trial court to consider the absence of a witness in ruling against Knecht Services, Inc., on count V of the complaint. Count V was entitled "Poor Workmanship." In ruling against Knecht Services, the court found:

> "The evidence did support the fact that the corporations did employ servicemen guilty of shoddy workmanship, and persons with inadequate training and supervision to perform work to which they were assigned. This includes Bob Leo who was not available to testify. Without any contrary evidence from him, the evidence establishes unworkmanlike performance by Leo as well as other employees."

Defendants contend that, in order for an adverse inference to be drawn from the failure to produce a witness, it must be established that the witness was under the control of the party against whom the inference is to be drawn *and* that he could have been produced by the exercise of reasonable diligence. (Illinois Pattern Jury Instructions, Civil, No. 5.01 (3d ed. 1991).) Defendants contend that Bob Leo is no longer in their employ and has moved out of State. Thus, they contend that an unfavorable inference may not be drawn by their failure to call him. *Tuthill v. Belt Ry. Co.* (1908), 145 Ill. App. 50, 55.

However, we find that it does not appear that the judge drew an adverse inference from defendants' failure to call the wit-

ness; rather, the judge simply noted that plaintiff's evidence concerning the quality of the workmanship provided by Leo and others hired by Knecht Services sufficiently established that the company inadequately trained and supervised their servicemen who, in turn, provided shoddy workmanship. We do not find that the trial court erred in noting the absence of contrary testimony from the servicemen, given that neither Knecht nor any other defense witness had any personal knowledge of the service calls conducted solely by the servicemen. The consumers testified as to the shoddy workmanship, and their testimony was simply unrebutted by competent testimony.

Next, defendants argue that the trial court's judgment on count V was not supported by the evidence. Defendants first contend that there was no finding of intentional misconduct. However, it is clear that in most cases intent is not a material factor of the Consumer Fraud Act. *Walsh*, 122 Ill. App. 3d at 486.

Second, defendants claim that the work done by Knecht Services, Inc., is of generally high quality and the work done by Bob Leo was only occasionally not up to the high standards of Knecht Services. Defendants contend that, consequently, actionable deception under the Consumer Fraud Act was not established. Defendants cite *People ex rel. Hartigan v. Maclean Hunter Publishing Corp.* (1983), 119 Ill. App. 3d 1049, 1059, for the proposition that "[t]he Act prohibits deception rather than error."

Judgment was entered against Knecht Services, Inc., on count V, not on the basis that Bob Leo made an occasional mistake in performing services; rather, judgment was based on the fact that Knecht Services employed servicemen guilty of shoddy workmanship and persons with inadequate training and supervision to perform work to which they were assigned. This was not simply an error on behalf of Knecht Services. Using unqualified workers and representing them as something else constitutes unfair and deceptive practices under the Consumer Fraud Act.

Finally, defendants contend that the trial court erred in dismissing the counterclaim filed against Attorney General Hartigan. In the counterclaim, defendants sought to recover damages for allegedly libelous statements contained in a press release made by the Attorney General and certain other oral statements made to the press by his assistant Attorney Generals. Specifically, defendants alleged that the following false and misleading statements were made:

> "a. That James M. Knecht was not licensed to perform plumbing work.

b. That Knecht Services, Inc. had no officer or employee who was a licensed plumber.

c. That counterplaintiffs had 'cheated' customers in their business dealings.

d. That the general quality of the work done by counterplaintiffs was 'shoddy, incomplete, unsatisfactory or unnecessary.' "

The trial court granted the Attorney General's section 2—619(a)(9) motion to dismiss (Ill. Rev. Stat. 1987, ch. 110, par. 2—619(a)(9)) on the basis of absolute immunity. Defendants contend that simply because conduct is arguably authorized or within the scope of the duties of the Attorney General does not entitle such conduct to be absolutely privileged. Defendants contend that the analysis of absolute immunity should be based upon the activity involved rather than the office held. If the conduct is essentially a bureaucratic task which could be performed by any number of employees, defendants contend that absolute immunity should not apply.

■■■ ■ Initially, we note that a complaint should not be dismissed, pursuant to section 2—619, unless it clearly appears that no set of facts can be proved which would entitle the plaintiff to recover. (*Ogle v. Fuiten* (1984), 102 Ill. 2d 356, 360-61.) In assessing a section 2—619 motion to dismiss, the trial court must take all facts properly pleaded as true. (*Wheeler v. Caterpillar Tractor Co.* (1985), 108 Ill. 2d 502, 505.) On review, the appellate court is concerned only with questions of law presented by the pleadings. (*Ronning Engineering Co. v. Adams Pride Alfalfa Corp.* (1989), 181 Ill. App. 3d 753, 758.) "The standard of review on appeal is whether the complaint alleged facts which sufficiently state a cause of action." *Alford v. Phipps* (1988), 169 Ill. App. 3d 845, 857.

■■■ The Attorney General contends that he is entitled to absolute immunity since the allegedly libelous statements were made in conjunction with a matter clearly committed to the responsibility of the Attorney General. The Attorney General relies on *Barr v. Matteo* (1959), 360 U.S. 564, 3 L. Ed. 2d 1434, 79 S. Ct. 1335, which held that a director of a governmental agency, who issued a press release stating why he intended to suspend two employees, was immune from liability. The court emphasized the reasons for the privilege, stating:

"It has been thought important that officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies

which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government." *Barr*, 360 U.S. at 571, 3 L. Ed. 2d at 1441, 79 S. Ct. at 1339.

The Supreme Court noted that the immunity doctrine is limited to situations in which the official's act is within the scope of his powers. (*Barr*, 360 U.S. at 572, 3 L. Ed. 2d at 1441, 79 S. Ct. at 1340.) The Court held that the issuance of the press release was within the "outer perimeter" of the defendant's line of duty, which was sufficient to render the privilege applicable. *Barr*, 360 U.S. at 575, 3 L. Ed. 2d at 1443, 79 S. Ct. at 1341.

The rationale of *Barr* was adopted by our supreme court in *Blair v. Walker* (1976), 64 Ill. 2d 1. The *Blair* court held that the Governor is protected from actions for civil defamation by an absolute privilege when issuing statements which are legitimately related to matters committed to his responsibility. (64 Ill. 2d at 10.) The court explained that "[t]he Governor must be afforded an absolute privilege commensurate with the scope of the discretion he is required to exercise if the goal of unrestrained and fearless administration of government is to be achieved." (*Blair*, 64 Ill. 2d at 10.) The court recognized that the effective functioning of a free government depends largely on the force of an informed public opinion, and thus it is within the bounds of the Governor's inherent, discretionary authority of his office to inform the public of actions he had directed to be instituted against the plaintiffs. *Blair*, 64 Ill. 2d at 10.

More recently, the appellate court has adopted the rulings of *Barr* and *Blair* in *Morton v. Hartigan* (1986), 145 Ill. App. 3d 417, and *Dolatowski v. Life Printing & Publishing Co.* (1990), 197 Ill. App. 3d 23. In *Morton*, the court held that the Attorney General, the first assistant Attorney General, and the division chiefs are absolutely immune from civil liability for acts done within the scope of their employment. In *Dolatowski*, the court held that a deputy police superintendent is protected from liability by absolute privilege for alleged defamatory statements made by him within the scope of his responsibilities. The defendant in *Dolatowski* told a newspaper reporter that the plaintiff was among 14 women charged with the unlawful solicitation of rides along a roadway. The defendant then stated that the crackdown on prostitution would continue. The court held that the statements made by the defendant were within the scope of his duties and, thus, were absolutely privileged. *Dolatowski*, 197 Ill. App. 3d at 28-29.

Defendants contend that the above cases are inconsistent with a number of Supreme Court decisions handed down after *Barr*. Most recently is *Forrester v. White* (1988), 484 U.S. 219, 98 L. Ed. 2d 555, 108 S. Ct. 538, in which the Court held that a State court judge does not have absolute immunity from a suit for damages under section 1983 of the Civil Rights Act (42 U.S.C. §1983 (1988)) for his decision to demote and dismiss a court employee. The employee, a probation officer, alleged that she was demoted and discharged on the basis of her sex, in violation of the equal protection clause of the fourteenth amendment. In determining whether immunity should apply, the court utilized a "functional" approach, whereby the nature of the functions with which a particular official has been entrusted is examined in order to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions. (*Forrester*, 484 U.S. at 223-24, 98 L. Ed. 2d at 563, 108 S. Ct. at 542.) The Court noted that judges have long enjoyed absolute immunity from liability in damages for their judicial or adjudicatory acts, primarily in order to protect judicial independence by insulating judges from vexatious actions by disgruntled litigants. (*Forrester*, 484 U.S. at 226, 98 L. Ed. 2d at 564, 108 S. Ct. at 543-44.) However, the Court stated that truly judicial acts must be distinguished from the administrative, legislative, or executive functions that judges may occasionally be assigned by law to perform. (*Forrester*, 484 U.S. at 227, 98 L. Ed. 2d at 565, 108 S. Ct. at 544.) The Court concluded that the defendant judge was acting in an administrative capacity, rather than a judicial capacity, when he demoted and discharged the plaintiff; consequently, he was not entitled to absolute immunity. *Forrester*, 484 U.S. at 229, 98 L. Ed. 2d at 566, 108 S. Ct. at 545.

 Even assuming, without deciding, that the functional approach is applicable here, we find that the statements of the Attorney General in the case at bar were privileged. It is the function and responsibility of the Attorney General to bring consumer fraud actions. As such, he must be allowed to keep the public informed of his actions without fear of personal liability. Educating and informing the public is just as much a part of the Attorney General's function as prosecuting fraudulent and deceptive practices. We find that his actions were essentially governmental in character and thus protected under the immunity doctrine. See *Hanzel Construction, Inc. v. Wehde & Southwick, Inc.* (1985), 130 Ill. App. 3d 196, 200.

The Attorney General also raises the issue of sovereign immunity, claiming that the Court of Claims has exclusive jurisdiction. However, given our above ruling we need not address this issue.

For all the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

REINHARD, P.J., and UNVERZAGT, J., concur.