WILLIAMS, Circuit Judge.
Mortimer Bober brought a class action lawsuit against the firms that manufacture and market Zantac 75 and Zantac 150, the over-the-counter and prescription strength forms of the stomach acid reliever raniti-dine, on the ground that the firms provide consumers with false and misleading information about the substitutability of the two drugs, in violation of Illinois law. The district court dismissed Bober’s claims under Fed.R.Civ.P. 12(b)(6) after concluding that Illinois law exempted the statements *937 at issue from being a possible basis of liability. We affirm.
I
Zantac 150 is manufactured and sold by British drug company Glaxo Wellcome PLC and its American subsidiary Glaxo Wellcome, Inc. The Food and Drug Administration (“FDA”) has approved it for use in the treatment of various digestive tract conditions, including certain lands of ulcers and certain esophageal conditions. As its name suggests, it contains 150 milligrams of ranitidine. And, it is available only with a prescription.
Zantac 75 is manufactured by Glaxo Wellcome, Inc. and is sold by Warner-Lambert Consumer Healthcare, a joint venture formed by Glaxo Wellcome, Inc. and Warner-Lambert Company, another American drug company. According to its FDA-approved packaging, it is to be used for the relief and prevention of heartburn associated with acid indigestion and sour stomach. As its name too suggests, it contains 75 milligrams of ranitidine. But, it may be purchased without a prescription.
Bober’s complaint alleges that Glaxo Wellcome PLC and the other three defendants (“Glaxo”) provide false and misleading information regarding whether Zantac 75 can be substituted for Zantac 150. The answer to that question was important to Bober because, at the time he filed this lawsuit, he was paying $1.47 per tablet for the Zantac 150 his doctor had prescribed for him, while an equivalent dose of Zantac 75 (two tablets) cost $.80. In an effort to obtain information on the substitutability of Zantac 75 and Zantac 150, Bober twice called a consumer hotline for Zantac 75 users set up by Warner-Lambert. When Bober first called the Zantac 75 consumer hotline, the hotline operator “told Mr. Bo-ber that Zantac 75 and Zantac 150 were not the same medications, and that Mr. Bober could not substitute two Zantac 75 tablets for one Zantac 150 tablet.” When Bober called the hotline a second time, a recorded message advised Bober, “If your doctor has directed you to take prescription Zantac, you should not substitute Zan-tac 75 for your prescription.”
Bober’s complaint also notes that Warner Lambert maintains a web site providing information about Zantac 75, although the complaint does not say whether Bober ever visited the web site. At the time Bober filed his complaint, a page' on that web site answering frequently asked questions about Zantac 75 responded to a question about whether Zantac 75 could be substituted for Zantac 150 by informing visitors, “If your physician has prescribed a medicine, you should not substitute any other medicine for your prescription. You should always ask your physician any questions you may have about changing your medication.”
In his complaint, Bober claims that the three quoted statements are false and misleading because, contrary to what the three statements imply, Zantac 75 and Zantac 150 contain the same medicine (ranitidine) and are therefore readily substitutable. On that basis, Bober’s complaint alleges that the three statements violate the Illinois Consumer Fraud and Deceptive Business Practices Act (“CFA”) and the similar laws of other states.[1] Bober’s complaint also alleges that the defendants illegally conspired to violate the CFA and that the defendants were unjustly enriched by their illegal practices. The *938 district court dismissed Bober’s claims under Fed.R.Civ.P. 12(b)(6), reasoning that the CFA exempted the three statements at issue from being possible bases of liability under the CFA because the statements were authorized by state and federal law. As the statements at issue did not violate the CFA, the district court further concluded that the statements would not support Bober’s common law claims. Bober’s estate, taking up Bober’s claims in the wake of his recent passing, appeals. As with all Rule 12(b)(6) dismissals, we review the district court’s decision de novo, taking the plaintiffs allegations as true and drawing all reasonable inferences in his favor. Jacobs v. City of Chicago, 215 F.3d 758, 764-65 (7th Cir.2000).
II
A
In relevant part, the CFA provides: Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the “Uniform Deceptive Trade Practices Act”, approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.
815 Ill. Comp. Stat. 505/2. To establish a violation of the CFA’s prohibition on deceptive acts or practices, a plaintiff must prove that: (1) the defendant engaged in a deceptive act or practice; (2) the defendant intended that the plaintiff rely on the act or practice; and (3) the act or practice occurred in the course of conduct involving a trade or commerce. Zekman v. Direct Am. Marketers, Inc., 182 Ill.2d 359, 231 Ill.Dec. 80, 695 N.E.2d 853, 860 (1998); Siegel v. Levy Org. Dev. Co., 153 Ill.2d 534, 180 Ill.Dec. 300, 607 N.E.2d 194, 198 (1992). Only the first of these requirements is at issue here.
In particular, Glaxo argues that the statements Bober’s complaint identifies as the deceptive acts or practices supporting his CFA claim are, as a matter of law, not deceptive. Under the CFA, a statement is deceptive if it creates a likelihood of deception or has the capacity to deceive. People ex reí. Hartigan v. Knecht Servs., Inc., 216 Ill.App.3d 843,159 Ill.Dec. 318, 575 N.E.2d 1378, 1387 (1991); see also Gmphic Sales, Inc. v. Sperry Univac Div., Sperry Corp., 824 F.2d 576, 580 (7th Cir.1987). Thus, in determining whether the allegations in Bo-ber’s complaint state a claim for relief that satisfies the requirements of Rule 12(b)(6), we ask whether the allegedly false and misleading statements on which Bober based his CFA claim can be read to create a likelihood of deception or to have the capacity to deceive.
Bober’s estate contends that the • three statements at issue are deceptive in essentially three ways. First, Bober’s estate asserts that the statements falsely claim that Zantac 75 and Zantac 150 do not contain the same medicine. None of the statements, however, expressly makes such a claim. The statements do claim that the two drugs are different medications, but that claim is completely true. The drugs are approved for very different maladies, went through different approval processes, and are sold in different ways. Moreover, to the extent that anyone could imply from the statements at issue that the drugs contain different medicine, information available to Zantac users, and in Bober’s possession, would dispel any such implication. Cf. Tudor v. Jewel Food *939 Stores, Inc., 288 Ill.App.3d 207, 224 Ill.Dec. 24, 681 N.E.2d 6, 8 (1997) (dismissing a CFA claim on the ground that the allegedly deceptive act was not deceptive in light of all the information available to the plaintiff); Saunders v. Michigan Ave. Nat’l Bank, 278 Ill.App.3d 307, 214 Ill.Dec. 1036, 662 N.E.2d 602, 607-08 (1996) (same). The web page that answers frequently asked questions about Zantac 75 (a printout of which is attached to Bober’s complaint) expressly states that Zantac 75 and Zantac 150 contain the same medicine. Likewise, the packaging information for Zantac 75 (which is also attached to Bo-ber’s complaint) strongly suggests the same fact when it explains that the active ingredient in Zantac 75 is ranitidine and promotes Zantac 75’s safety by noting that prescription strength Zantac has an excellent safety record. Put simply, none of the three statements at issue can reasonably be read as falsely claiming or implying that Zantac 75 and Zantac 150 do not contain the same medicine.
Second, Bober’s estate asserts that, in describing Zantac 75 and Zantac 150 as different medications and discouraging substitution of the former for the latter, the three statements at issue misrepresent the therapeutic equivalence of equal doses of the two drugs (an equivalence we assume exists in reviewing the sufficiency of Bober’s complaint) by implying that Zantac 150 is more effective than Zantac 75 in treating the conditions for which Zantac 150 is prescribed.[2] While it is clear that the statements at issue go out of their way to avoid any implication that equal doses of the drugs are therapeutically equivalent,[3] we think that the statements also avoid any implication that the drugs are not therapeutically equivalent. In the context of all the information available to Bober and other Zantac users, including the three statements at issue, the packaging information for Zantac 75, and the Zantac 75 frequently asked question web page, it should have been clear to Bober and other Zantac users both that Zantac 75 and Zantac 150 contain the same active ingredient and that inquiries about substituting the former for the latter are properly directed to a user’s treating physician. The available information, in our view, dispels any tendency to deceive that the statements at issue might otherwise have had. Cf. Tudor, 224 Ill.Dec. 24, 681 N.E.2d at 8; Saunders, 214 Ill.Dec. 1036, 662 N.E.2d at 607-08. Accordingly, none of, the three statements at issue can reasonably be read as misrepresenting the therapeutic equivalence of equal doses of Zantac 150 and Zantac 75.
.Finally, Bober’s estate asserts that the statements at issue both claim and imply that Zantac 75 simply cannot be substituted for Zantac 150, despite the fact that it would be perfectly appropriate for a *940 doctor to recommend such a substitution. Again, the problem for Bober’s estate is that examining the statements at issue, together and in the context of the other information available to Zantac users, eliminates any possibility of deception with regard to substitutability. Cf. Tudor, 224 Ill.Dec. 24, 681 N.E.2d at 8; Saunders, 214 Ill.Dec. 1036, 662 N.E.2d at 607-08. From such a perspective, the statements discouraging substitution can only be read to discourage users from making a substitution without consulting their physicians. So read, the statements do not falsely claim or imply that Zantac 75 cannot be substituted for Zantac 150. As a matter of law, none of the three statements on which Bober based his CFA claims is deceptive.
B
Alternatively, Glaxo argues that all three of the statements are protected by section 10b(l) of the CFA, which excludes from liability “actions ... specifically authorized by laws administered by any regulatory body or offices acting under statutory authority of this State or the United States.” 815 Ill. Comp. Stat. 505/10b(l). It also argues that the statements were “labeling” specifically authorized by the FDA under authority of the Food, Drug, and Cosmetic Act (FDCA),' 21 U.S.C. § 321 et seq.
The case law interpreting the relevant portion of the CFA’s exemption provision is not entirely clear on the question of what is meant by “specifically authorized.” Contrast Weatherman v. Gary-Wheaton Bank of Fox Valley, N.A., 186 Ill.2d 472, 239 Ill.Dec. 12, 713 N.E.2d 543, 547-51 (1999); Lanier v. Assocs. Fin., Inc., 114 Ill.2d 1, 101 Ill.Dec. 852, 499 N.E.2d 440, 447 (1986); Jackson v. South Holland Dodge, Inc., 312 Ill.App.3d 158, 244 Ill.Dec. 835, 726 N.E.2d 1146, 1151-55 (2000); Mario’s Butcher Shop & Food Ctr., Inc. v. Armour & Co., 574 F.Supp. 653, 655-56 (N.D.Ill.1983), with Martin v. Heinold Commodities, Inc., 163 Ill.2d 33, 205 Ill.Dec. 443, 643 N.E.2d 734, 742-43 (1994); Pawlikowski v. Toyota Motor Credit Corp., 309 Ill.App.3d 550, 243 Ill.Dec. 1, 722 N.E.2d 767, 770-75 (Ill.App.Ct.1999), appeal denied, 188 Ill.2d 567, 246 Ill.Dec. 125, 729 N.E.2d 498 (2000); Heastie v. Cmty. Bank of Greater Peoria, 690 F.Supp. 716, 720-21 (N.D.Ill.1988). See also Robinson v. Toyota Motor Credit Corp., 315 Ill.App.3d 1086, 249 Ill.Dec. 120, 735 N.E.2d 724, 733-34 (2000), appeal allowed, 192 Ill.2d 708, 252 Ill.Dec. 85, 742 N.E.2d 335 (2000); Aurora Firefighter’s Credit Union v. Harvey, 163 Ill.App.3d 915, 114 Ill.Dec. 873, 516 N.E.2d 1028, 1032-34 (1987).
However, we think that the Illinois cases can be reconciled. The two key decisions from the Illinois Supreme Court are Weatherman, 186 Ill.2d 472, 239 Ill.Dec. 12, 713 N.E.2d 543, and Martin, 163 Ill.2d 33, 205 Ill.Dec. 443, 643 N.E.2d 734. In Weatherman, the court found that a disclosure of certain real estate closing fees presented in a summary form complied with specific federal regulatory requirements. In so ruling, it , found that the summary did not violate the CFA, because it was “specifically authorized” by the federal Real Estate Settlement Procedures Act, or RESPA. This was enough to entitle the summary to an exemption under section 10b(l). 239 Ill.Dec. 12, 713 N.E.2d at 550. The court was aware of, and distinguished, its earlier opinion in Martin. There it had found that the exemption was not available for a document that only facially or technically complied with a disclosure requirement imposed by the Commodities Futures Trading Commission. In spite of this technical compliance, the document in fact misrepresented the nature of a particular fee. The court also pointed out that the CFTC itself had issued an opinion holding that language in technical compliance with the regulations may nev *941 ertheless violate federal regulations if it is misleading in context. 205 Ill.Dec. 443, 643 N.E.2d at 742-43.
Taken together, the cases stand for the proposition that the state CFA will not impose higher disclosure requirements on parties than those that are sufficient to satisfy federal regulations. If the parties are doing something specifically authorized by federal law, section 10b(l) will protect them from liability under the CFA. On the other hand, the CFA exemption is not available for statements that manage to be in technical compliance with federal regulations, but which are so misleading or deceptive in context that federal law itself might not regard them as adequate.
The question is thus whether the statements Bober complains of are sufficiently within what is authorized by federal law that Glaxo is entitled to section' 10b(l) protection. On this question, we limit our examination to the operator’s statement — the only one that is even potentially misleading.[4] The regulations implementing the FDCA are extensive and extremely detailed. Of particular relevance to the “different medications” part of the operator’s statement are the regulations defining what constitutes a “new drug.” A drug may be considered new based on “[t]he newness of use of such drug in diagnosing, curing, mitigating, treating, or preventing a disease ... even though such drug is not a new drug when used in another disease or to affect another structure or function of the body.” 21 C.F.R. § 310.3(h)(4). Before any “new drug” can be marketed, the manufacturer has to file a “new drug application” and meet the various testing, production, and labeling requirements set out in the Code. There is no dispute that Zantac 75 satisfies this definition of new drug. Even if we assume that in all other relevant respects it is identical to Zantac 150, Zantac 75 is marketed as a nonprescription treatment for acid indigestion, while Zantac 150 is a prescription drug treatment for duodenal and gastric ulcers (among other things). Indeed, Glaxo submitted a new drug application prior to marketing Zantac 75. Glaxo therefore is not just specifically authorized to call these different “drugs”; it is required to do so. The only remaining question for our purposes is the relation between the term “drug” and the term “medication.” Unlike “drug,” “medication” does not appear to be a term of art in the federal regulations. The regulations governing the labeling and advertising of OTC drug products, however, provide as follows:
(i) the following terms may be used interchangeably in the labeling of OTC drug products, provided such use does not alter the labeling of OTC drug products ...
(52) “medication(s)” or “medicine(s)” or “drug(s)”
21 C.F.R. § 330.1(i). This provision indicates that, with respect to labeling Zantac 75, Glaxo was specifically authorized to use the terms “drugs” and “medications” as synonyms. Given that for federal regulatory purposes Zantac 75 and Zantac 150 were indeed different “drugs,” the express terms of the regulations taken as a whole specifically authorized Glaxo to say that they were different “medications,” even if the statement may have led Mr. Bober as a layperson to misunderstand what was being said. See Weatherman, 239 Ill.Dec. 12, 713 N.E.2d at 550 (concluding that where summary fee statement was sufficient to satisfy federal regulatory requirements, allegation that *942 statement was misleading to customers was properly dismissed).
The second half of the operator statement is not so easily dealt with, but ultimately we believe that the Illinois courts would find that it too was specifically authorized. The situation here is not a common one. When Mr. Bober asked whether he could substitute Zantac 75 for Zantac 150, the operator said he “could not.” In assessing whether this was a specifically authorized response, it is significant that the federal regulations governing drug labeling and advertising imposed competing constraints on Glaxo, such that Mr. Bober’s question was particularly tricky to answer. The manufacturer of a drug may not recommend or even suggest uses for a drug that are not approved by the FDA or supported by sufficient medical evidence. 21 C.F.R. § 330.1(d) (OTC advertising); 21 C.F.R. § 202.1(e)(6) (prescription advertising). There is no dispute that Zantac 75 had not been tested for the use to which Mr. Bober sought to put it, which means that Glaxo was prohibited from even suggesting that substitution would be appropriate. A drug is considered to be misbranded if its labeling or advertising makes any “statements comparing the safety or effectiveness, either greater or less of the drug with other agents for the same indication” if that statement is not supported by “adequate and well-controlled studies.” 21 C.F.R. § 201.57(c)(3)(v) (prescription labeling); 21 C.F.R. § 201.6(a) (general labeling). Glaxo concedes that it had not conducted any studies that would have allowed it to say that two Zantac 75 tablets would be less (or more) effective than one Zantac 150 tablet for treatment of Mr. Bober’s illness. Glaxo’s position was thus precarious. It had to answer Mr. Bober’s question in a way that did not suggest he could use Zantac 75 for an “off label” purpose, while at the same time it had to avoid the unsubstantiated suggestion that Zantac 150 would be superior to Zantac 75. This was a fine line to walk, and one not considered in Martin or Weatherman; unlike in those cases, Glaxo was required by federal law to say a certain amount and simultaneously required not to say too much.
Glaxo chose to reconcile its competing obligations by answering Bober’s question with the statement “you cannot substitute” Zantac 75 for Zantac 150. This statement was technically accurate, because only Bo-ber’s doctor could approve an “off-label” use for Zantac 75 and the substitution of one drug for the other. The statement was also consistent with those federal regulations requiring Glaxo to refrain from suggesting “off-label” uses for Zantac 75. In protecting itself on that side, however, Glaxo predictably opened itself up to the claim Mr. Bober is now making, namely that the statement improperly suggested that Zantac 150 was superior to Zantac 75. While Glaxo could have added “ask your doctor” without being accused of suggesting an “off-label” use and thus perhaps struck a more perfect balance between its competing regulatory obligations, under the circumstances what it chose to say and not to say was a sufficiently careful compromise to fall within what is specifically authorized by federal law.
The pharmaceutical industry is highly regulated, both at the federal level and internationally. Technical requirements abound, and it is not only possible but likely that ordinary consumers will find some of them confusing, or possibly misleading as the term is used in statutes like Illinois’s CFA. But, recognizing the primacy of federal law in this field, the Illinois statute itself protects companies from liability if their actions are authorized by federal law. (Such protection would amount to nothing if it applied only to statements that were not susceptible to misunderstanding; those statements would *943 escape liability under the CFA in any event.) Because Glaxo’s statements fall within the boundaries established by federal law, under Weatherman and Martin they are entitled to protection under section 10b(l) of the CFA.[5]
C
Bober’s complaint does not state a claim for relief under the CFA, and the district court properly dismissed Bober’s CFA claim. Because Bober’s civil conspiracy claim depends on his establishing that the defendant drug companies violated the CFA, the district court also properly dismissed that claim. See Adcock v. Brakegate, Ltd., 164 Ill.2d 54, 206 Ill.Dec. 636, 645 N.E.2d 888, 894 (1994). Our conclusion is the same with respect to Bober’s unjust enrichment claim, as, in the absence of any deception on the part of the defendants, the requisite violation of “fundamental principles of justice, equity, and good conscience” is not present. See Alliance Acceptance Co. v. Yale Ins. Agency, Inc., 271 Ill.App.3d 483, 208 Ill.Dec. 49, 648 N.E.2d 971, 976-77 (1995) (quoting HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc., 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 678-79 (1989)).
Ill
For the foregoing reasons, Bober’s complaint fails to state a claim for relief. Accordingly, we Affirm the judgment of the district court.

. Neither party has addressed whether other states actually have similar laws or whether those laws differ in any material respect from the CFA. Accordingly, we will assume, as the parties assume, that the sufficiency of Bober’s allegations in this regard depends entirely on whether his complaint states a claim under the CFA.

. Relatedly, Bober's estate also asserts that because there is no substantiation for the proposition that Zantac 150 is more effective than Zantac 75 in treating conditions for which Zantac 150 is prescribed, the statements at issue violate the CFA by implying that that proposition is correct. As we explain below, the statements do not, in our view, carry any implication about the relative effectiveness of the two drugs. In any event, the case law Bober’s estate cites in support of its claim that a lack of substantiation can be deceptive makes clear that a lack of substantiation is deceptive only when the comparative claim at issue implies that there is substantiation for the claim made. BASF Corp. v. Old World Trading Co., 41 F.3d 1081, 1088-91 (7th Cir.1994) (interpreting the Lanham Act’s ban on false advertising). Here, the statements at issue do not imply that there is substantiation for a claim about the relative effectiveness of Zantac 75 and Zantac 150.

. A prudent strategy, to say the least, given that the FDA prohibits drug companies from promoting off-label uses for medications they manufacture or market, 21 C.F.R. § 330.1(d).

. For the reasons discussed above, we believe that none of the statements is deceptive, but because the concurring judge disagrees with respect to the operator's statement, we also consider whether that statement is excluded from liability under section 10b(l).

. To the extent the defendants also argue that state and federal law exempt them from liability regardless of how the CFA’s exemption provision is interpreted, we decline .to address that argument.