**Zenovia ELLIOTT, on behalf of herself and all others similarly situated, Plaintiff,**

**v.**

**ITT CORPORATION, formerly known as International Telephone & Telegraph Corporation; ITT Consumer Financial Corporation; Aetna Finance Company, doing business as ITT Financial Services, and formerly known as ITT Thorp Corporation; ITT Lyndon Life Insurance Company; and American Bankers Life Assurance Company of Florida, Defendants.**

**No. 90 C 1841.**

United States District Court,
N.D. Illinois, E.D.

Nov. 12, 1992.

REPORT AND RECOMMENDATION

GOTTSCHALL, United States Magistrate Judge.

TO THE HONORABLE MARVIN E. AS-PEN, one of the Judges of the United States District Court for the Northern District of Illinois.

This matter is before the court on the motion for class certification of plaintiff Zenovia Elliott. In the face of defendants' attack on her ability to adequately represent the class, plaintiff has also moved to amend the complaint to add another person as class representative. For the reasons set forth below, this court recommends that both motions be denied.

**MOTION FOR CLASS CERTIFICATION**

In this action, plaintiff complains of "insurance packing" by corporate entities related to ITT Corporation ("ITT").[1] Plaintiff de-

---

1. The defendant entities that actually entered into loan transactions with plaintiff and members

scribes that practice as involving the use of unfair and deceptive means to induce the purchase of insurance in connection with consumer credit transactions. The picture plaintiff would depict is that of an organization-wide preoccupation with insurance sales, permeating all levels of the corporate structure. Among support for her allegation that the alleged practice is nationwide, plaintiff has assembled evidence that attorney generals of a number of states have brought actions based on insurance packing by ITT.

As an example of the manner in which ITT's borrowers are allegedly coerced into purchasing insurance products such as credit life insurance, plaintiff relies heavily on the testimony of James Matthews ("Matthews"), formerly a high-ranking ITT officer. Matthews' 1989 declaration states that when borrowers closed on their loans, they were presented with pretyped documents which included charges for insurance that they had not requested. As an inducement to sign the documents, the loan check was often placed in open view. If the consumer complained that he or she did not wish to purchase the insurance, ITT personnel allegedly told the consumer that he or she would have to come back later, after new documents had been prepared.

Plaintiff here entered into two loans with ITT. On the first occasion, she declined to purchase insurance. On the second, she purchased insurance. The insurance application forms signed in connection with both loans are found at Exhibits K–L of the appendix to ITT's memorandum in opposition to class certification. DX K–DX L.[2] Those forms state that the purchase of credit life or credit disability insurance is not required to obtain the loan and is not a factor in the approval of the loan. On the first of those statements, plaintiff and her husband state that they do not wish to purchase insurance coverage, while on the second form they state a desire for coverage. In connection with the second loan, plaintiff's husband and the loan officer also signed a disclosure statement to the effect that plaintiff's husband had been advised that the coverage was optional. DX M. Here, plaintiff states in her reply brief that "it is probable that virtually all of the class members signed the same or very similar written disclosure forms." Reply at 32.

 Both sides have submitted a good deal of evidence bearing on the factual question of whether ITT indeed followed a practice of "packing" insurance. The parties' discussion of the issue also includes a good deal of argument on the merits. While the court may not consider such arguments at the class certification stage, it takes into account the substantive elements of plaintiff's claims and it looks to the proof necessary to those elements so as to envision the form trial on those issues would take. *Spicer v. Chicago Bd. Options Exchange, Inc.*, [1989–1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,943 at 95,249 (N.D.Ill.1990) (citing *Simer v. Rios*, 661 F.2d 655, 672 (7th Cir.1981), *cert. denied*, 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982)). Throughout this analysis, the court bears in mind that a principal purpose of class certification is to save the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical manner. *See General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 155, 102 S.Ct. 2364, 2369, 72 L.Ed.2d 740 (1982).

On pages 2–15 of her brief in support of class certification, plaintiff describes a nationwide practice whereby ITT employees were pressured to sell insurance products to

---

of the putative class are consumer credit subsidiaries of ITT. American Bankers Life Assurance Corporation of Florida ("American Bankers"), an issuer and seller of insurance products, is also a defendant in this action. Because details of the relationship between these corporate entities are immaterial to the outcome here, this report will refer to them collectively as "defendants" or "ITT." As appropriate, references to "ITT" will include American Bankers. The disposition of this motion has, however, made it unnecessary to

address defenses to class certification unique to American Bankers.

2. Hereafter, plaintiff's exhibits are designated "PX" and defendants' exhibits "DX." Unless specified otherwise, references to plaintiff's exhibits are to those on its opening brief on class certification. References to defendants' exhibits are to the exhibits in the appendix to ITT's memorandum in opposition to class certification.

consumer borrowers, without regard to the products' suitability to the borrowers' needs. Although plaintiff has not found a written policy statement explicitly directing such insurance practices, Matthews has testified that such a policy existed. Supporting evidence takes various forms, including internal communications encouraging insurance sales and reports in which the level of sales achieved in different geographical areas is compared. There is evidence to the effect that poor sales performance was a negative factor in employee evaluations. For instance, one April 1989 memorandum criticizes loan officers for "over emphasizing the optional nature of the insurances." PX CC. At the same time, the documents submitted also support an inference that sales performance was not uniform; if all employees had succeeded in their sales efforts, there would be no need for negative comments in reports and employee evaluations.

Defendants' factual summary is found at pages 4–18 of their memorandum in opposition to class certification. This response includes a number of arguments that go to the merits, such as the contention that it is not unlawful to pressure salespeople to sell a product. Defendants also devote considerable argument to the evidentiary value of the Matthews declaration on which plaintiff relies so heavily. While this court cannot consider defendants' legal arguments or weigh the evidence here, it can look to the proof that defendants would present to counter plaintiff's accusations.

Defendants' theory is that ITT has in effect a comprehensive program to ensure that customers are informed that the purchase of insurance is voluntary. As proof of that proposition, ITT has submitted affidavits of several of its officers describing steps taken to ensure that this message is communicated to the customer. For example, the vice-president with ultimate responsibility for the compliance program states that since March 1989, ITT has recorded consumer loan closings on audio tape if the customer permits it to do so. At those closings, employees are to read statements reminding the customer that the purchase of insurance is optional. *See* DX A.

As is the case with plaintiff's evidence, one cannot say that ITT's evidence invariably supports its theory. While some of consumer affidavits submitted, as well as ITT's training materials and forms discussing the voluntary nature of insurance purchases bear dates going back to at least 1984, some of the compliance efforts appear to be more recent. Indeed, Matthews has testified that state consumer fraud investigations had an impact on ITT insurance sales practices.

Against this backdrop, the court turns to the standards governing class certification.

*Class Definition*

Plaintiff seeks to certify the following class:

> ... all other persons (located anywhere in the United States) injured by "insurance packing" practices of ITT consumer credit subsidiaries. The class consists of all persons who satisfy the following criteria: (a) They signed a financing agreement with an ITT consumer credit subsidiary. (b) The financing agreement provided for the purchase of insurance. (c) The transaction file does not contain any documentation of a request by the consumer for the insurance sold made prior to the preparation of the loan documents. Persons who are already members of a certified class in a class action against an ITT consumer credit subsidiary alleging insurance packing are excluded, as are persons who have signed releases of their claims.

Complaint ("Cmplt."), ¶ 57. Although the class definition in the complaint contains no temporal limitation, plaintiff states in her motion for class certification that she would represent "current borrowers of defendants ITT Consumer Financial Corporation and/or Aetna Finance Company, doing business as ITT Financial Services." She would also reserve the right to expand the class to include persons no longer having current loans with ITT.

Defendants have challenged the sufficiency of the above class definition. Although there is no explicit requirement concerning the class definition in Fed.R.Civ.P. ("Rule") 23, courts have held that the class

must be adequately defined and clearly ascertainable before a class action may proceed. *Harris v. General Dev. Corp.*, 127 F.R.D. 655, 658 (N.D.Ill.1989) (citations omitted). An identifiable class exists if its members can be ascertained by reference to objective criteria, but not if membership is contingent on the prospective member's state of mind. *Gomez v. Illinois State Bd. of Education*, 117 F.R.D. 394, 397 (N.D.Ill. 1987). The class represented must be ascertainable since the outcome of the class action is res judicata as to all unnamed class members. *Harris*, 127 F.R.D. at 658. For instance, in *Harris* the plaintiffs sought to certify a class consisting of potential applicants who "were deterred" from applying for jobs with an employer. *Id.* In order to determine whether a person was so deterred, and hence a class member, the court would have to inquire into the state of mind of individual class members. *Id.* Noting that identification of class members would entail individual adjudications, the class definition was found overly imprecise and speculative. *Id.* Instead of dismissing the action on this basis, however, the court went on to redefine the class as including applicants who were actually denied employment by the defendant. *See id.*

Defendants here contend that the class definition is unworkable because no federal or state law requires a written request by the consumer for insurance prior to the preparation of loan documents. In support of that proposition, they present affidavits expressing the opinion that disclosures regarding insurance purchases need only be made in the loan documents themselves. DX E, DX N. Since there would therefore be no pre-closing written requests for insurance coverage, defendants believe the class as presently defined would potentially include all consumers who purchased insurance in connection with loan transactions. Consumers who made voluntary, deliberate decisions to purchase insurance would be included.[3]

Defendants also note that the type of documentation in consumer loan files would vary over time. For instance, since 1989, ITT utilizes a standard document that memorializes customers' requests for insurance prior to the completion of loan documents. DX A, ¶ 6.

Defendants' case law support for their argument concerning the class definition is the decision in a case wherein an automobile owner sought to represent a class comprised of similarly situated auto owners whose cars had been towed, impounded and sold for scrap metal without their having been provided opportunity to prevent the destruction of their cars. *Kohn v. Mucia*, 776 F.Supp. 348 (N.D.Ill.1991). Although the *Kohn* plaintiff had received no notice whatsoever that his car would be sold for scrap metal, his class definition included car owners who had received notice via first class mail. (The statute authorizing the disposition of unclaimed vehicles in fact required notice to the owner.) Since persons receiving notice had a chance to prevent destruction of their cars, these potential class members would not have suffered the same injury as the named plaintiff. *Id.* at 353. Individual adjudications would be necessary to ascertain whether car owners had received no notice and were therefore members of the class. *Id.*

*Kohn* denied certification on the basis of failure to establish numerosity, although problems of lack of commonality and typicality were also present. The sufficiency of the class definition was not challenged by the *Kohn* defendants, and the class was effectively redefined in the decision. Thus, the discussion of class certification concludes with the following comment:

> Once the classes have been properly narrowed to those people whose cars were older than seven years, and properly registered when destroyed; who received no notice whatsoever; and whose then cur-

---

3. Plaintiff defends inclusion in the class of these consumers on the basis that even if the purchase was voluntary, these consumers still paid more than the insurance would have cost them if they had purchased it from an independent agent. Plaintiff's complaint does not include allegations to this effect, however. While plaintiff's argu-

ment suggests a potential for amendment and a subclass, arguably permissible here, plaintiff later states that these consumers could be excluded from the class. Reply at 36–37. Given the outcome on this motion, this report will not consider redefinition of the class.

rent addresses were on file with the Secretary of State, then it is only speculation to claim that the classes are sufficiently numerous to satisfy Rule 23, based on the showing that Kohn has made.

*Id.*

■ Defendants find *Kohn* analogous in that individual adjudications would be needed here in order to determine whether, despite disclosures to the contrary, consumers were led to believe that loans were conditioned upon the purchase of insurance. Thus, they contend that the injury essential to class membership cannot be determined without individual adjudications. This problem is, however, present in many class actions. A class may be certified even though the initial definition includes members who have not been injured or do not wish to pursue claims against the defendant. *See, e.g., Joseph v. General Motors Corp.,* 109 F.R.D. 635, 639–640 (D.Colo.1986). *See also Sturdevant v. Deer,* 73 F.R.D. 375, 378 (E.D.Wis.1976); *Rota v. Brotherhood of Railway, Airline and Steamship Clerks,* 64 F.R.D. 699, 706 (N.D.Ill.1974). Normally, the question of injury to individual class members is deferred until after resolution of the common questions. While there are cases where surrounding circumstances cast doubt on the existence of the class as defined, those cases tend to be the exception, rather than the rule. If class certification were denied at this early stage on the basis that injury to individual class members would have to be proven on an individual basis, many classes might never be certified.

■ Unlike *Kohn,* plaintiff's class definition here is not overinclusive, as the injury to both the named plaintiff and potential class members is apparently the same. Nor must the court accept defendants' premise that incidents of "insurance packing" represent isolated departures from firmly entrenched company policy. Looking to the discussion of defective class definitions in *Harris,* the court notes that the criteria for inclusion in the class is not a factor so speculative as state of mind. Other authority adds that while a class does not have to be so ascertainable that every potential member can be specifically identified at the commencement of the action, the description of the class must be sufficiently definite so that it is "administratively feasible" for a court to ascertain whether a particular individual is a member of the class. *Joseph v. General Motors Corp.,* 109 F.R.D. 635, 639 (D.Colo. 1986). Here, inclusion in the class turns on the presence or absence of documentary evidence that a potential plaintiff was advised in advance of their loan closing that insurance was optional. Since this initial determination of class membership may be made by reviewing loan files, it is administratively feasible to ascertain the identities of class members. This court therefore concludes that the class is sufficiently defined. Having made that determination, the court turns to the requirements of Rule 23.

### Rule 23

■ In moving for class certification, a movant has the burden of proving that all requirements of Rule 23 are met. *General Telephone of the Southwest Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372–73, 72 L.Ed.2d 740 (1982); *Trotter v. Klincar,* 748 F.2d 1177, 1184 (7th Cir.1984). The process is comprised of two steps. Rule 23(a) provides that:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Besides demonstrating that all four elements of Rule 23(a) are met, the movant must satisfy one of the requirements of Rule 23(b). *Spencer v. Central States, Southeast and Southwest Areas Pension Fund,* 778 F.Supp. 985, 989 (N.D.Ill.1991); *Alexander v. Centrafarm Group, N.V.,* 124 F.R.D. 178, 182 (N.D.Ill.1988).

■ Looking first to the alternatives under Rule 23(b), the parties take divergent positions on the question of whether one or

more type of action may be maintained here. Plaintiff contends that the proposed class could be certified under either Rule 23(b)(2) or 23(b)(3). Under Rule 23(b)(2), certification may be granted where the "party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." *E.g., In re School Asbestos Litigation*, 789 F.2d 996, 1008 (3d Cir.), *cert. denied sub nom. Celotex Corp. v. School Dist. of Lancaster*, 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986). A class may be certified under Rule 23(b)(3) upon findings that the questions of law or fact common to members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. *E.g., Riordan v. Smith Barney*, 113 F.R.D. 60, 65 (N.D.Ill.1986). While plaintiff would prefer certification under Rule 23(b)(2), defendants maintain that the proposed class could be certified only under Rule 23(b)(3), if at all.

Plaintiff would bring this lawsuit within the limitations of Rule 23(b)(2), despite the due process problems that might attend that subsection's lack of a provision for opt-out. *See In re A.H. Robins, Inc.*, 880 F.2d 709, 745 (4th Cir.), *cert. denied sub nom. Anderson v. Aetna Casualty and Surety Co.*, 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989) (noting that under Rule 23(b)(2) absent class members are bound without notice); *Williams v. Lane*, 129 F.R.D. 636, 640–641 (N.D.Ill.1990). Another major limitation on the use of that subsection is the requirement that injunctive or declaratory relief, rather than money damages, be the predominant relief requested. *See* Advisory Committee's Note on the 1966 Amendment to Rule 23, 39 F.R.D. 69, 102 (1966).

It is true that classes have been certified under Rule 23(b)(2) in cases where monetary damages were part of the relief requested, but the majority have been in areas such as civil rights labor or employment; such actions are often by their very nature class suits. *See Harris v. General Dev. Corp.*, 127 F.R.D. 655, 663–664 (N.D.Ill.1989). In assessing whether this form of class action is appropriate here, this court would look to whether "the realities of the litigation," demonstrate that the suit is brought primarily for money damages. *Christiana Mortgage Corp. v. Delaware Mortgage Bankers Ass'n*, 136 F.R.D. 372, 381 (D.Del.1991) (citation omitted). If so, certification under Rule 23(b)(2) may be denied even if some injunctive relief may be appropriate at some point in the litigation. *Id.*

Plaintiff brings a three-count complaint based on alleged violations of state consumer fraud laws, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.* The RICO claim seeks monetary damages only, equal to three times insurance premiums paid plus finance charges on those premiums. While the requested relief under TILA includes rescission, there is also a request for monetary damages in an amount equal to "packed" insurance premiums and finance charges related to that portion of each loan transaction. As pleaded, the consumer fraud count seeks only monetary damages, although plaintiff has mentioned a right of rescission in the pleadings on class certification and included the standard request for other appropriate relief in her prayer for relief. While plaintiff would broadly characterize her action as seeking a declaration that ITT's practices are unlawful and that borrowers may rescind their loan contracts, this court cannot realistically conclude that injunctive or declaratory relief is the predominant relief requested. Accordingly, this report will treat this action as one for certification under Rule 23(b)(3).

Having thus determined which form the proposed class action might take, this report addresses the requirements of Rule 23(a) next. Defendants have not challenged plaintiff's showing of numerosity, the first element under Rule 23(a). Indeed, they state that potentially over one million loans are involved.

■ The finding of numerosity may be supported by common sense assumptions. *In re VMS Securities Litigation*, 136 F.R.D.

466, 473 (N.D.Ill.1991). Although defendants contend that borrowers involuntarily purchasing insurance could not be numerous, there is not a need for individual adjudications to decide whether this element is met if there is alternative evidence suggesting numerosity. In this court's view, the fact that a number of class actions have challenged defendants' alleged practices, combined with the number of loans potentially at issue, provide a sufficient basis from which one could conclude that numerosity is satisfied.

In defendants' arguments concerning typicality under Rule 23(a)(3) and adequacy of representation under Rule 23(a)(4), they make reference to arguments in their motion for summary judgment. As part of the inquiry into adequacy of representation, they also ask the court to consider aspects of plaintiff's response to their motion for summary judgment. That motion deals with defenses arguably unique to plaintiff's claim, but it is not part of the referral to this court. While decision on these two elements of Rule 23(a) would not address all the questions to be decided on summary judgment, this motion can be decided by addressing only matters bearing on the claims of all class members. Consequently, typicality and adequacy of representation are not addressed here.

▓▓▓ The remaining requirements under Rule 23 are commonality under Rule 23(a)(2) and the two-pronged test under Rule 23(b)(3).[4] "A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). The fact that there is some factual variation among class members' grievances will not defeat certification. *Id.* at 1017. In considering whether common questions of law and fact predominate under Rule 23(b)(3), the common issues need not be dis-

positive of the entire litigation. *Riordan v. Smith Barney*, 113 F.R.D. 60, 65 (N.D.Ill. 1986). The predominance factor requires that the court ascertain "the existence of a group which is more bound together by a mutual interest in the settlement of common questions than it is divided by the individual members' interest in the matters peculiar to them." *Spicer v. Chicago Bd. Options Exchange*, [1989–1990 Transfer Bender] Fed. Sec.L.Rep. (CCH) ¶ 94,943 at 95,254 (N.D.Ill. 1990). In addressing predominance, the court is not required to mechanically sum up the common and individual issues and predict which will consume more time, a result that would unduly block class actions from going forward because only the most complex of common questions would require more litigation time than a series of individual trials. *Simer v. Rios*, 661 F.2d 655, 672 (7th Cir. 1981), *cert. denied*, 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982). Instead, resolution of the predominance question tends to focus on the form trial on the issues would take, with consideration of whether the action would be manageable. *See id.* at 672–673.

▓▓▓ Manageability is one of the factors bearing on the second prong of Rule 23(b)(3)—the inquiry into whether a class action is superior to other available methods for the fair and efficient adjudication of the controversy. *See Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 164, 94 S.Ct. 2140, 2146, 40 L.Ed.2d 732 (1974). "This consideration encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Id.*

The questions of commonality under Rule 23(a)(3) and predominance under Rule 23(b)(3) are closely related. *Heastie v. Community Bank of Greater Peoria*, 125 F.R.D.

---

4. Rule 23(b)(3) provides that an action may be maintained as a class action where the following conditions are met:

"[t]he court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

669, 674 (N.D.Ill.1989). *See also In re United Energy Corp. Solar Power Modules Tax Shelter Invest. Securities Litigation,* 122 F.R.D. 251, 254 (C.D.Cal.1988) (noting that finding of predominance implies common questions exist, satisfying commonality). This report will address these two requirements against the backdrop of the theory of substantive law raised in each count of the complaint. Thus, this report will address in turn common questions under state consumer fraud acts, RICO and TILA. As part of the discussion of each count, this report will also consider whether this litigation is manageable.

### Count I—Consumer Fraud and Deceptive Business Practices Act

 In Count I of her complaint, plaintiff alleges that the practice of insurance packing violates the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121½, § 261 *et seq.* ("Consumer Fraud Act").[5] Section 2 of the Consumer Fraud Act, prohibiting "unfair or deceptive acts or practices," provides as follows:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965, [Ill.Rev.Stat. ch. 121½, § 312] in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section

5(a) of the Federal Trade Commission Act [15 U.S.C. § 45].

Ill.Rev.Stat. ch. 121½, § 262. The United States Supreme Court has set forth the following standards for determining whether a practice is unfair:

> " '(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).' "

*People v. Knecht Services, Inc.,* 216 Ill. App.3d 843, 159 Ill.Dec. 318, 325, 575 N.E.2d 1378, 1385 (2d Dist.1991) (quoting *Federal Trade Comm'n v. Sperry and Hutchinson Co.,* 405 U.S. 233, 244–245 n. 5, 92 S.Ct. 898, 905 n. 5, 31 L.Ed.2d 170 (1972)). Although Illinois courts look to the Federal Trade Commission Act for guidance in determining whether a practice is "unfair," the inquiry under the Consumer Fraud Act also requires a case-by-case determination of unfairness. *See Elder v. Coronet Ins. Co.,* 201 Ill.App.3d 733, 146 Ill.Dec. 978, 982, 558 N.E.2d 1312, 1316 (1st Dist.1990). To establish that a practice is "deceptive" within the meaning of the statute, a plaintiff must show (1) a deceptive act or practice, (2) an intent by the defendant that he rely on the deception, and (3) that the deception occurred in the course of conduct involving a trade or business. *Knecht Services,* 159 Ill.Dec. at 327, 575 N.E.2d at 1387. In affirmative misrepresentation or omission cases, a plaintiff must also allege the misrepresentation of a material fact. *Id.*

Defendants here have questioned whether plaintiff's consumer fraud claim raises common questions of law or of fact. Since the

---

**5.** In the briefs on class certification, plaintiff has alternatively taken the position that defendants' practices violate the unfair and deceptive acts and practices ("UDAP") statute of Minnesota. This contention is made as part of plaintiff's response to defendants' allegation that differences in state consumer fraud statutes preclude a finding that there are common issues of law in this litigation. Given the court's conclusion that differences in state laws are not in themselves reason to deny certification in this case, this report will not address the potential applicability of Minnesota law.

class plaintiff would have certified is a nationwide class of consumers receiving loans from ITT, defendants contend that the laws of all 33 states where they do business would apply. Referring to a law review article discussing differences in state consumer fraud statutes,[6] defendants contend that individual questions of law predominate over questions common to those state statutes. Plaintiff responds that that same article notes that all state UDAP statutes were inspired by and are to some extent patterned after the Federal Trade Commission Act. *See* Comment, 59 Tul.L.Rev. at 429. Plaintiff therefore sees class members' consumer fraud claims as involving common questions of law.

■ Defendants have cited a number of decisions in which federal courts have declined class certification because the laws of different states would apply to individual class members' claims. *See, e.g., Kirkpatrick v. J.C. Bradford Co.*, 827 F.2d 718, 725 (11th Cir.1987), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988); *In re Storage Technology Corp. Securities Litigation*, 630 F.Supp. 1072, 1080–1081 (D.Colo. 1986); *Zandman v. Joseph*, 102 F.R.D. 924, 929 (N.D.Ind.1984); *Elster v. Alexander*, 76 F.R.D. 440, 442 (N.D.Ga.1977), *appeal dismissed*, 608 F.2d 196 (5th Cir.1979). The task is understandably one that courts undertake with some measure of trepidation. As one decision has noted:

> "there will be a point at which the sheer magnitude of the task of construing the various laws will compel a court not to certify the multistate class or to reduce it to a more manageable number of states. Even short of that point, choice of law may pose major problems. The first is the danger of an unwarranted intrusion into another state's legal affairs through a mistaken application of its laws. The court should thus consider its own familiarity with the other state's law, the degree to which that law is unclear or unsettled, and the extent to which it implicates important interests of the other state."

*In re School Asbestos Litigation*, 789 F.2d 996, 1010 n. 11 (3d Cir.), *cert. denied sub nom. Celotex Corp. v. School Dist. of Lancaster*, 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986) (citing Note, *Multistate Plaintiff Class Actions: Jurisdiction and Certification*, 92 Harv.L.Rev. 718, 742 (1979)). Certain opinions suggest that the type of substantive law to be applied is also an important consideration in deciding whether common legal questions are present. *See, e.g., Coca–Cola Bottling Co. of Elizabethtown, Inc. v. Coca–Cola Co.*, 95 F.R.D. 168, 178–179 (D.Del.1982), *reconsideration granted on other grounds*, 98 F.R.D. 254 (D.Del.1983) (noting "myriad" of contract issues lurking in lawsuit, including 32 states' rules concerning parol evidence, third party beneficiaries, waiver and estoppel, imputed knowledge, novation, and so on).

In contrast to the above cases, other decisions decline to make a choice of law determination at the class certification stage. *In re Crazy Eddie Securities Litigation*, 135 F.R.D. 39, 41 (E.D.N.Y.1991). Having reviewed the cases cited by the parties, this court concludes that the potential application of different state laws is not in itself a deterrent to class certification. *See, e.g., In re Bally Mfg. Corp. Securities Litigation*, 141 F.R.D. 262, 270 (N.D.Ill.1992); *In re VMS Securities Litigation*, 136 F.R.D. 466, 480 (N.D.Ill.1991); *In re Alexander v. Centrafarm Group, N.V.*, 124 F.R.D. 178, 186 (N.D.Ill.1988); *In re School Asbestos Litigation*, 104 F.R.D. 422, 434 (E.D.Pa.1984), *aff'd in part and vacated in part on other grounds*, 789 F.2d 996 (3d Cir.), *cert. denied sub nom. Celotex Corp. v. School Dist. of Lancaster*, 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986); *Kleiner v. First Nat'l Bank of Atlanta*, 97 F.R.D. 683, 694–695 (N.D.Ga.1983); *In re Agent Orange Product Liability Litigation*, 506 F.Supp. 762, 787 (E.D.N.Y.1980), *modified*, 100 F.R.D. 718 (E.D.N.Y.1983), *mandamus denied*, 725 F.2d 858 (2d Cir.), *cert. denied sub nom. Diamond Shamrock Chemicals Co. v. Ryan*, 465 U.S. 1067, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984).

---

**6.** Comment, *Consumer Protection: The Practical Effectiveness of State Deceptive Trade Practices* *Legislation,* 59 Tul.L.Rev. 427 (Dec. 1984).

Illinois decisions have reached a similar conclusion in consumer fraud litigation. *Miner v. Gillette Co.*, 87 Ill.2d 7, 56 Ill.Dec. 886, 892, 428 N.E.2d 478, 484 (1981), *cert. dismissed,* 459 U.S. 86, 103 S.Ct. 484, 74 L.Ed.2d 249 (1982); *Eshaghi v. Hanley Dawson Cadillac Co.*, 214 Ill.App.3d 995, 158 Ill.Dec. 647, 652, 574 N.E.2d 760, 765 (1st Dist.1991); *Purcell and Wardrope Chartered v. Hertz Corp.*, 175 Ill.App.3d 1069, 125 Ill.Dec. 585, 589, 530 N.E.2d 994, 998 (1st Dist.1988). Where, as here, there are also common questions of federal law, differences in state law could be dealt with later in the litigation, through subclassing or decertification if state law problems become too unwieldy.

■ This court concludes that class certification is not precluded here by a predominance of individual legal issues over common legal questions. There remains, however, the issue of whether common questions of fact are present and whether those common questions predominate over fact questions involving only individual class members. As discussed below, this inquiry requires consideration of whether communications with borrowers were primarily written or oral.

In describing ITT's practices, plaintiff contends that ITT pressured employees to sell insurance by monitoring insurance sales and firing employees who did not meet sales quotas. Employees are alleged to have presented preprepared loan documents to consumers which included insurance premiums in the amount loaned, without any prior request or need for the insurance. During loan closings, loan checks were placed in plain sight of the customer. Because customers knew they would receive their loan checks as soon as the documents were signed, they usually signed the documents upon a cursory reading, or without reading the documents at all. If customers complained about the loan documents, they were told they would have to come back later to sign revised documents.

The above description suggests a kind of bait and switch, but it is unclear whether loan terms (before the inclusion of insurance) were initially reduced to writing. There is testimony that customers were quoted terms over the telephone, *e.g.*, Reply, PX B, ¶ 5, but no written evidence of such communications has been submitted. While each side has presented some of the documents from plaintiff's loan file, this court is uncertain as to whether the entire file has been submitted. For instance, there is no copy of a loan application.[7] On the basis of the evidence presented here, this court is unable to determine whether ITT's communications with borrowers were primarily oral.[8] The fact of oral communications would not necessarily preclude a finding that common questions predominate over individual fact issues, however, as classes have been certified where a uniform sales pitch was used to solicit sales. *See, e.g., In re American Continental Corp./Lincoln Sav. and Loan Securities Litigation,* 140 F.R.D. 425, 430–431 (D.Ariz. 1992).

Defendants contend that there is no common practice here, as ITT had a firm policy that borrowers be informed that the pur-

7. Plaintiff has attached as exhibits to her complaint copies of the notes and security statements signed in connection with each of her two loans. Plaintiff has not submitted other documents from her loan file in connection with the motion for class certification, although defendants have submitted the insurance application forms that were completed at the time of each transaction. The loan file for the second loan also included a form disclosure statement signed by plaintiff's husband and the loan officer, on which form both signatories attested that plaintiff's husband had been advised on the voluntary character of insurance overage.

8. If anything, the complaint suggests that a number of oral communications surrounded each loan transaction. Paragraph 40 contains the following description of the alleged practice:

> It is the policy and practice of the ITT consumer credit subsidiaries, including ITT Financial, to thereafter contact the customer, by mail or telephone, and advise the consumer that his or her loan has been approved without disclosing to the consumer the inclusion of insurance products, and to request that the consumer proceed to the ITT consumer credit subsidiary's office for the loan closing. ITT's consumer credit subsidiaries have established a policy of not informing consumers, at the time they are asked to come in for their closings, that the loan documentation that has been prepared includes insurance products not previously requested by the consumer, or that the quoted monthly payment amounts have been increased to include payments for such unrequested products.

chase of insurance was optional. In support of that argument, they point to the written disclosures to that effect in the insurance application forms signed by plaintiff. In addition, defendants point to a number of statements in their training materials reminding salespeople that insurance coverage is optional. Overall, defendants would categorize any incident of insurance packing as a departure from company policy. In the proposed class action, such deviations would have to be proven through evidence of oral statements made to borrowers. Among their case law support, defendants cite one decision from this circuit that denied class certification of consumer fraud claims where the alleged common practice principally involved oral communications. *See, e.g., Graham v. Security Sav. and Loan,* 125 F.R.D. 687, 691 (N.D.Ind.1989), *aff'd sub nom. Veal v. First American Sav. Bank,* 914 F.2d 909 (7th Cir. 1990) (addressing claim under Indiana Deceptive Practice Act together with other claims, including common law fraud and RICO).

Other decisions considering the certification of consumer fraud claims support a finding that there are common questions of fact in this case. For instance, a common practice was found where a beauty school's representations to potential students were conveyed by a variety of means, including printed advertisements, radio and television commercials, a catalog, a contract, and oral misrepresentations. *Rosario v. Livaditis,* No. 87 C 1224, 1988 WL 105303 at *1, 1988 U.S. Dist. LEXIS 11240 at 2–3 (N.D.Ill. Oct. 4, 1988), *aff'd,* 963 F.2d 1013 (7th Cir.1992).[9] Thus, a common question may be present even if oral communications are part of a defendant's message to the public. Alternatively, construing the question here as a failure to tell consumers the truth, a common fact question might still be presented. *See Eshaghi v. Hanley Dawson Cadillac Co., Inc.,* 214 Ill.App.3d 995, 158 Ill.Dec. 647, 574 N.E.2d 760 (1st Dist.1991) (commenting that class action could be based on car dealer's failure to inform customers of surcharge for

materials even though some customers might have learned of surcharge during the course of individual negotiations for work on their cars). *But see Elder v. Coronet Ins. Co.,* 201 Ill.App.3d 733, 146 Ill.Dec. 978, 987–89, 558 N.E.2d 1312, 1321–1323 (1st Dist.1990) (finding that uniform omission gave rise to deceptive practices claim, but denying certification because of individual questions bearing on existence of injury).

This court concludes that a common question of fact is presented here, although it has some reservations concerning the temporal and geographical scope of the proposed class. First, there is evidence that ITT responded to governmental actions against it by taking steps to improve compliance with consumer fraud laws. For instance, after 1989, many loan closings were apparently recorded on audio tape. Governmental actions against ITT are also said to have impacted on sales. Notably, Matthews states in his declaration that insurance sales were lower in states where there were such actions. Depending on the time and place of a customer's loan transaction, the likelihood of insurance packing might be less. Since variations such as these might be dealt with through subclassing or redefinition of the class, they do not in themselves preclude certification. Having concluded that the commonality requirement under Rule 23(b)(3) is satisfied, there remains the question of whether individual issues of fact would predominate over the common issues.

In addressing commonality and predominance of common issues, the parties cite numerous cases dealing with other kinds of fraud outside the context of consumer fraud statutes. Notably, many of the cited cases deal with securities fraud, in which reliance establishes the necessary causal connection between a defendant's misstatements or omissions and a plaintiff's decision to buy or sell securities. *See Rowe v. Maremont Corp.,* 850 F.2d 1226, 1233 (7th Cir.1988). Where the decision to invest is in large part based on an investor's oral communications

9. While the finding of a common scheme to defraud and deceive prospective students was upheld in the Seventh Circuit's opinion in *Rosario,* the parties did not challenge the lower court's finding under Rule 23(b)(3) that common issues predominated over individual issues. *See* 963 F.2d at 1017.

with his or her broker, class certification has generally been denied due to individual questions of reliance. *Shivangi v. Dean Witter Reynolds, Inc.*, 107 F.R.D. 313, 324–325 (S.D.Miss.1985), *aff'd*, 825 F.2d 885 (5th Cir. 1987); *Seiler v. E.F. Hutton*, 102 F.R.D. 880, 888–890 (D.N.J.1984). In contrast, many class actions for securities fraud are based on the "fraud on the market" theory discussed in *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), where reliance on an issuer's statements or omissions is presumed. Defendants in any number of these cases attack the predominance of common issues on the basis that misstatements inducing the purchase of securities vary from investor to investor. *See, e.g., In re Bally Mfg. Corp. Securities Litigation*, 141 F.R.D. 262, 267 (N.D.Ill.1992). *See also In re VMS Securities Litigation*, 136 F.R.D. 466 (N.D.Ill.1991). When such differences in the mix of information preceding the investment decision are raised in a fraud on the market case, the prevailing practice is to defer consideration of individual questions of reliance until after the decision on class certification. *See VMS*, 136 F.R.D. at 478. Plaintiff believes that consideration of reliance can similarly be dealt with here as part of individual inquiries into damages after trial on the common question of whether ITT engaged in the practice of insurance packing.

At least one decision has commented on the difficulty that attends an attempt to analogize between the role of reliance in claims of securities fraud and other types of fraud. *Maguire v. Sandy Mac, Inc.*, 138 F.R.D. 444, 451 (D.N.J.1991), *vacated on other grounds*, 145 F.R.D. 50 (D.N.J.1992). As that decision puts it, the presumption of "a nearly perfect market in information" underlies the fraud on the market theory. *Id.* Because the consumer market is a "non-perfect" market, *Maguire* concluded that the presumption of reliance in fraud on the market cases could not be extended to consumer fraud cases. *Id.* Instead, the relevant inquiries were vio-

lation of a consumer fraud statute and resulting injury. *See id.*

A repeated theme in plaintiff's argument concerning common fact issues is the well-established proposition that, because the Consumer Fraud Act is intended to provide broader consumer protection than the common law action for fraud, a plaintiff need not show actual reliance nor diligence in ascertaining the accuracy of misstatements made to him or her. *E.g., O'Connor v. Merrill Lynch Realty*, 220 Ill.App.3d 522, 163 Ill.Dec. 245, 102, 581 N.E.2d 196, 202 (1st Dist.1991), *appeal denied*, 143 Ill.2d 636, 167 Ill.Dec. 397, 587 N.E.2d 1012 (1992); *Harkala v. Wildwood Realty, Inc.*, 200 Ill.App.3d 447, 146 Ill.Dec. 232, 236, 558 N.E.2d 195, 199 (1st Dist.1990); *IK Corp. v. One Financial Place Partnership*, 200 Ill.App.3d 802, 146 Ill.Dec. 198, 208, 558 N.E.2d 161, 171 (1st Dist.), *appeal denied*, 135 Ill.2d 556, 151 Ill.Dec. 383, 564 N.E.2d 838 (1990).[10] *See also Sullivan's Wholesale Drug Co., Inc. v. Faryl's Pharmacy, Inc.*, 214 Ill.App.3d 1073, 158 Ill. Dec. 185, 193, 573 N.E.2d 1370, 1378 (5th Dist.), *appeal denied*, 141 Ill.2d 561, 162 Ill. Dec. 510, 580 N.E.2d 136 (1991) (material misrepresentations are actionable under Consumer Fraud Act even when actual reliance has not been established). As one decision explains,

> Defendant asserts that a class action may not be maintained since the element of reliance is a question which is individual to each class member and thus defeats class action status. Defendant's contention is based upon the argument that different customers would have individual reactions to defendant's advertising while others may not have seen it at all. Under the common law, reliance was an element which had to be alleged in order to constitute a valid cause of action for misrepresentation or deceit.... However, the language employed in the Consumer Fraud

---

10. Defendants' cite case authority that is not necessarily to the contrary. *Lidecker v. Kendall College*, 194 Ill.App.3d 309, 141 Ill.Dec. 75, 550 N.E.2d 1121 (1st Dist.1990). Comparing the elements of a claim under the Consumer Fraud Act to those of common law fraud, *Lidecker* states that the elements of a deceptive practices claim

include "justifiable reliance." *Id.* 141 Ill.Dec. at 78, 550 N.E.2d at 1124. Because materiality remains an element of a consumer fraud claim based on misrepresentations or omissions, the *Lidecker* case is not necessarily inconsistent with the other decisions cited here.

Act clearly indicates that it is the intent of the defendant in his conduct, not the reliance or belief of the plaintiff, which is the pivotal point upon which an action arises. *Brooks v. Midas–Internat'l Corp.*, 47 Ill. App.3d 266, 5 Ill.Dec. 492, 496, 361 N.E.2d 815, 819 (1st Dist.1977) (citations omitted).

Extrapolating from the above cases, this court agrees that the cause of action under the fraud on the market theory of federal securities law is similar to the cause of action under the Consumer Fraud Act in that a plaintiff need not prove reliance in either type of action, if certain other conditions are present. In the case of consumer fraud, the plaintiff must establish a violation of the applicable statute; in the case of a fraud on the market claim, the plaintiff would at least have to establish that the securities in question were traded on an established market.

This court does not, however, believe that the correspondence between the two types of fraud extends so far as plaintiff would have it. Under the fraud on the market theory, proof of fraudulent statements to the investing public generally looks to the content of a group of uniform statements to the public, whereas proof of the practice alleged here would entail review of a representative sample of individual transactions. In this court's view, there is a good possibility of possibly significant variations in the mix of information presented to customers. As a result, individual questions of reliance are more likely to predominate than in an action under the fraud on the market theory.[11] In considering whether subclassing or some other means could be used to efficiently deal with these individual questions, the court considers the nature of the evidence in each plaintiff's case and a problem of proof not generally confronting plaintiffs bringing claims under the fraud on the market theory.

Plaintiff's claim of a deceptive practice is not based on a written representation that the purchase of insurance was a mandatory precondition to her loan. Indeed, she con-cedes that a standard written disclosure to the contrary was signed by her and probably included in the documents provided to all class members. Thus, in each instance where a customer signed a disclosure form, he or she will have to deal with documentary evidence that the customer was informed that the purchase of insurance was optional. Assuming that appropriate disclosures were included in insurance applications, some factor persuaded each class member that he or she should disregard the statements. In many cases oral representations likely convinced the customer to disregard the disclosures. For instance, plaintiff arranged for two loans from ITT. In connection with the first transaction, she signed a disclosure form, but did not purchase insurance. On the second occasion, she signed the same form disclosure statement, but purchased insurance. Where, as here, defendants have evidence that they informed a consumer of the optional nature of insurance purchases in written documents, they should be allowed to question the consumer concerning the factors that persuaded him or her to purchase insurance.

When a written disclosure of the truth accompanies an oral falsehood, the true statement discredits the falsehood. *Pommer v. Medtest Corp.*, 961 F.2d 620, 624 (7th Cir.1992). *See also Assoc. in Adolescent Psychiatry S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 571 (7th Cir.1991), *cert. denied,* ——— U.S. ———, 112 S.Ct. 1182, 117 L.Ed.2d 426 (1992). Since written disclosures are at least arguably as compelling as oral statements, the need to prove the existence of the lie would make the task of proving consumer fraud all the more difficult in many cases. As is not the case in an action under the fraud on the market theory, and because of the conflicting and presumably varying messages confronting purchasers of insurance, one cannot assume the kind of uniform communications on a nationwide basis that would justify a presumption that customers were deceived.[12] There is thus a substantial likeli-

---

**11.** For instance, even if the plaintiff in a securities action is a "sophisticated investor" or acts on a tip from a broker, the individual plaintiff's assessment of an investment is ultimately derived from the same market information available to investors generally.

**12.** Previously in this discussion, the court commented that the success of efforts to deceive

hood of many individual questions in a piece of litigation involving a potentially enormous class. This court is compelled to conclude that litigation of this nature would not be manageable.

Having thus concluded that the requirements of Rule 23(b)(3) are not met, the court recommends that plaintiff's consumer fraud claim not be certified.

### RICO Claim

In Count II of her complaint, plaintiff alleges that the practice of insurance packing constitutes a scheme or artifice to defraud within the meaning of the federal mail and wire fraud statutes. 18 U.S.C. §§ 1341 and 1343. These acts of mail and wire fraud are further alleged to be predicate acts of racketeering under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO").

As in the case of plaintiff's consumer fraud claim, defendants challenge class certification on the basis that individual questions of reliance predominate over issues common to the RICO claim. At least one decision suggests that reliance is an element of the cause of action under RICO. See Freedman v. Arista Records, Inc., 137 F.R.D. 225, 229 (E.D.Pa. 1991).[13]

 Plaintiff correctly notes that neither materiality nor reliance are elements of either mail fraud or wire fraud. See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1415 (3d Cir.), cert. denied, — U.S. —, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991); McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786, 791 (1st Cir.), cert. denied, 498 U.S. 992, 111 S.Ct. 536, 112

L.Ed.2d 546 (1990); United States v. Cronic, 900 F.2d 1511, 1513–1514 (10th Cir.1990); Armco Industrial Credit Corp. v. SLT Warehouse Co., 782 F.2d 475, 481–482 (5th Cir. 1986). In establishing a scheme to defraud, what is essential under these statutes is the devising of or the intention to devise a scheme to defraud. See Heastie v. Community Bank of Greater Peoria, 125 F.R.D. 669, 674 (N.D.Ill.1989). Since that question depends only on the defendant, the existence of racketeering activity is a common question of law and fact. Id.

At the same time, a plaintiff lacks standing to bring a RICO claim, unless he or she has been injured in his or her business or property by the violation. Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496–497, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (citation omitted). The right to sue under RICO's treble damages provision requires a showing of injury and that the defendant's violation was the proximate cause of the plaintiff's injury. Holmes v. Securities Investor Protection Corp., — U.S. —, —, —, —, 112 S.Ct. 1311, 1317–1318, 117 L.Ed.2d 532 (1992). This aspect of the RICO claim must be determined on an individualized basis. Heastie, 125 F.R.D. at 675. See also Maguire v. Sandy Mac, Inc., 138 F.R.D. 444, 450 (D.N.J.1991), vacated on other grounds, 145 F.R.D. 50 (D.N.J.1992). While the language in Freedman describes this inquiry as involving individual questions of "reliance," the full text of the opinion indicates that the problem could alternatively be described as involving individualized questions of causation or injury. Thus, the presence or absence of individual questions of "reliance" is not dispositive here.

---

customers might vary over time and geographic location. For instance, in a particular office or sales region, there might be a good deal of uniformity in representations made to customers. This report expresses no opinion on the feasibility of certifying a class smaller than the nationwide class proposed here.

13. Freedman commented that those plaintiffs' RICO claims were based on allegations of fraud and that "[f]raud requires inducement to act in reliance on the conduct of which the plaintiffs complain." Id. Freedman considered a claim that class members of the singing group Milli Vanilli fraudulently represented that they sang

the songs on their album. Ultimately, Freedman refused to certify the class, presenting the following reasoning for its conclusions:

Here, the question of reliance is highly individualized. What causes a person to respond positively to a performance is a complex matter, especially in these modern times where popular musical performances involve visual as well as auditory stimulation. One's response to art is personal and as such is not susceptible to a class based determination of inducement as in securities fraud cases.

Id. (citation omitted).

In the discussion of plaintiff's consumer fraud claim, this court discussed the factors complicating the determination of whether individual class members were actually deceived by defendants. To prove that plaintiffs were "compelled" to purchase insurance, it would be necessary to determine what borrowers were told about the insurance. *See Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir.1989) (affirming district court refusal to certify RICO claim where proof of oral communications was needed to establish that plaintiffs were compelled to take polygraph examinations). Because individual determinations of injury would overwhelm this litigation, this court concludes that certification of Count II is inadvisable.

### TILA Claim

■ Count III of plaintiff's complaint is based on alleged violations of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"). According to the complaint, defendants' disclosure of credit terms was insufficient under the TILA in that the insurance premiums for "packed" insurance should have been included in the "finance charge," rather than the "amount financed" disclosed on loan documents. As a consequence, the stated "finance charge" and "annual percentage rate" are allegedly inaccurate. Cmplt., ¶ 84. Where there is such noncompliance with TILA disclosure requirements, a plaintiff retains the right under TILA § 125, 15 U.S.C. § 1635, to rescind for up to three years after the loan transaction. Cmplt., ¶¶ 83, 85.

Defendants respond with citation to authority that technical compliance with TILA disclosure requirements regarding credit life insurance is all that is required of a lender. *USLIFE Credit Corp. v. Federal Trade Comm'n*, 599 F.2d 1387, 1390 (5th Cir.1979). Although this argument on the merits cannot be addressed at the class certification stage, they have also raised another question concerning the propriety of this type of class action under TILA § 125.

■ One court has questioned whether Congress intended that there be class actions

seeking rescission under TILA § 125. *Nelson v. United Credit Plan, Inc.*, 77 F.R.D. 54, 58 (E.D.La.1978). Among the *Nelson* court's reservations, it observed that there would be a conflict of interest between class members seeking rescission relief from a credit institution of limited solvency. *Id. Nelson* also observed that the need for class actions seeking rescission is not apparent, given the availability of an award of attorneys' fees to individual plaintiffs bringing actions for rescission. *See id. See also* 15 U.S.C. § 1640(a)(3). Another court has commented that allowance of class actions would be in derogation of a creditor's right under 15 U.S.C. § 1635(b) to act on a rescission claim before the matter can be brought before a court. *James v. Home Construction Co. of Mobile, Inc.*, 621 F.2d 727, 731 (5th Cir.1980).

On the other hand, at least one class has been certified under the TILA, with the option to rescind being offered after settlement of the common claim. *See Tower v. Moss*, 625 F.2d 1161, 1163–1164 (5th Cir.1980). Plaintiff here notes that the option to rescind, rather than mandatory rescission, is sought. This circuit has also found class actions to be a superior means of adjudicating certain claims of defective disclosure under the TILA. *See Goldman v. First Nat'l Bank of Chicago*, 532 F.2d 10, 16 (7th Cir.), *cert. denied*, 429 U.S. 870, 97 S.Ct. 183, 50 L.Ed.2d 150 (1976). *Goldman* was not an action under 15 U.S.C. § 1635, however.

Had plaintiff sought only an order directing ITT to correct specific deficiencies in its written disclosures, the court might readily find that certification is appropriate.[14] Given the form of TILA relief requested in plaintiff's complaint, however, the above authorities militate against certification of a class action under 15 U.S.C. § 1635. Without definitively resolving the issue of whether an action seeking rescission under TILA § 125 can ever be certified, this court concludes that this class TILA claim would not meet the requirements of Rule 23(b)(3). Under the regulations implementing the TILA, the term "finance charge" is defined as follows:

14. Arguably, such an action might also be brought under Rule 23(b)(2).

The finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit.

12 C.F.R. § 226.4(a) (1992).

(d) *Insurance.* (1) Premiums for credit life, accident, health, or loss-of-income insurance may be excluded from the finance charge if the following conditions are met:

(i) The insurance coverage is not required by the creditor, and this fact is disclosed.

(ii) The premium for the initial term of insurance coverage is disclosed....

(iii) The consumer signs or initials an affirmative written request for the insurance after receiving the disclosures specified in this paragraph. Any consumer in the transaction may sign or initial the request.

(2) Premiums for insurance against loss of or damage to property, or against liability arising out of the ownership or use of property, may be excluded from the finance charge if the following conditions are met:

(i) The insurance coverage may be obtained from a person of the consumer's choice, and this fact is disclosed.

(ii) If the coverage is obtained from or through the creditor, the premium for the initial term of insurance coverage shall also be disclosed.

12 C.R.R. § 226.4(d).

Plaintiff here does not complain that ITT's written documents omit the language required under the above provisions of Regulation Z. Nor does she contend that ITT's borrowers sign an affirmative request for insurance coverage. Instead, plaintiff complains that ITT's written statements do not reflect the realities of the transaction. Contrary to the disclosures, the purchase of insurance is required as a precondition to the extension of credit.

As noted in connection with plaintiff's consumer fraud claim, there are individual questions of fact as to whether borrowers were misled concerning ITT's credit terms. Looking to the requirements under the TILA, if borrowers understood that insurance was not required, the premium could be excluded from ITT's stated finance charge. This determination under the TILA involves essentially the same fact determination as plaintiff's consumer fraud claims. As in the case of the consumer fraud claims, this court must conclude that the sheer magnitude of the individual fact issues in need of resolution will make this litigation unmanageable. Accordingly, this court cannot recommend certification of Count III.

Having concluded that all three counts of the complaint fail to meet the requirements of Rule 23(b)(3), this court recommends that plaintiff's motion for class certification be denied.

### MOTION TO FILE AN AMENDED COMPLAINT

In response to defendants' arguments concerning her adequacy as class representative, plaintiff has moved to file an amended complaint. The proposed amendment would add another class member as class representative.

In the preceding report on class certification, this court recommended that certification be denied on grounds generally applicable to the class. Because the proposed amendment would not rectify the deficiency in the present class complaint, this court recommends that the motion be denied.

### CONCLUSION

For the reasons set forth above, this court recommends that plaintiff's motion for class certification be denied. The court further recommends that plaintiff's motion to file an amended complaint be denied.

Counsel are given ten days from the date hereof to file objections to this Report and Recommendation with the Honorable Marvin E. Aspen. Failure to object constitutes waiver of the right to appeal.